No. 3--06--0865

Filed October 5, 2007.

IN THE APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2007

| | | |
|---|---|---|
| ANDREW ROSZAK, | ) | Appeal from the Circuit Court |
| | ) | for the 21st Judicial Circuit |
| | ) | Kankakee County, Illinois |
| Plaintiff-Appellant, | ) | |
| | ) | No.   06-MR-14 |
| v. | ) | |
| | ) | |
| KANKAKEE FIREFIGHTERS' | ) | |
| PENSION BOARD, | ) | |
| | ) | Honorable |
| | ) | Kendall O. Wenzelman |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE CARTER delivered the opinion of the court:

Applicant Andrew Roszack, a firefighter-paramedic employed by the Kankakee Fire Department, filed for a line of duty disability pursuant to the Illinois Pension Code (40 ILCS 5/4-110 (West 2006)), with appellee Kankakee Firefighters' Pension Board (hereinafter the Board). The Board denied his request for disability and applicant appealed to the circuit court of Kankakee County. The circuit court denied applicant's request for disability and affirmed the decision of the Board. Applicant has now appealed the circuit court's ruling, claiming that the Board's decision to deny him disability was against the manifest weight of the evidence. We reverse the decision of the circuit court and remand for further proceedings in accordance with this opinion.

1

FACTS

Applicant filed his application for disability pay with the Board on September 10, 2004. Two hearings were held with regard to the matter, one on February 17, 2005, and a concluding hearing on August 25, 2005. At the February 17 hearing, applicant was the only witness to take the stand. Applicant testified as follows.

Applicant was employed as a firefighter-paramedic with the Kankakee Fire Department at the time of the injury. He had been hired by the department in September 2000. His duties included responding to and mitigating emergency situations and fire inspections and investigations. On December 2, 2003, while on duty, he responded to a call and upon arrival found an elderly female patient, between 300 and 400 pounds, on the floor. He and his female partner began to lift the woman to place her on to the stretcher, but as they did so, the wheels got caught and bound up on a rug, causing the wheels not to lock into place and properly deploy. They had to juggle the woman and try and gently lower her to the ground, which they did. At this time applicant and his partner experienced some pain in their upper backs. Backup was called to help transport the woman to the hospital, and applicant then sought medical attention for his back.

The following day, December 3, 2003, applicant was examined by Dr. J. Michael Panuska, the city's occupational health/workers' compensation doctor. In January 2004 applicant saw Dr. George Charuk, who gave him pain medication and kept him on lifting limitations. Applicant then saw his family doctor, Dr. Samuel Deguzman, in March 2004 who referred him to Dr. Benjamin Goldberg. Dr. Goldberg recommended surgery to applicant as his best opportunity for getting better and returning to work. Surgery was scheduled three times between April and August 2004 but had to be repeatedly postponed due to insurance problems with workers' compensation refusing to pay

2

for the surgery. Workers' compensation finally authorized the surgery and it was performed on August 31, 2004, by Dr. Goldberg.

Applicant testified that he had been in pain since the injury happened and he elected to get surgery so that he would have the chance to come back to work. After the surgery, he was still no better. At the time of the hearing, he had pain under his left shoulder blade, which was always present. If he was on his feet for a long period of time, the pain increased. He could not raise his left arm above his head.

On cross-examination by the Board, applicant revealed that he was 25 years old. He still loved his job and did not want to quit. As of the hearing date, he was employed as a cardiopulmonary resuscitation, or CPR, instructor at Kankakee Community College on a part-time basis, a nonphysical job. As of that date, he was not getting workers' compensation payments. A dispute then arose between applicant and the Board as to applicant's present address. The Board inquired as to the applicant's current address and the applicant responded that he did not have a current address at that time but had been staying with his mother, sister, and other family members. He listed a post office box address where he could be contacted. After much confusion and back and forth, with the Board persisting on wanting to know where the applicant was residing, applicant provided his mother's address. The hearing was adjourned after some more questions.

The hearing resumed on August 25, 2005. Since the first hearing, applicant had undergone a magnetic resonance imaging, or MRI. The first witness called in the second hearing was Dr. Panuska. He testified as follows.

Dr. Panuska first described what the MRI conducted on applicant on May 17, 2005, revealed. Namely, it indicated that there had been some surgical repair. Dr. Panuska testified that when

3

applicant first came to see him immediately after the incident in December 2003, he never found any evidence of a shoulder injury but, rather, diagnosed him with a thoracic strain. After that Panuska referred him to another doctor and lost track of the case. Panuska testified that applicant seemed to have full range of motion at the initial exam, but now, after surgery, the longer he goes without rehabilitation the worse the injury will get. Panuska admitted that lifting a heavy patient could cause the type of injury exhibited by applicant. He also admitted on cross-examination that the thoracic area where he diagnosed applicant's strain on December 2, 2003, also covered the scapula area, which was the shoulder blade. Panuska admitted that it was not farfetched to believe that the shoulder blade had been involved from the initial time when it covers the same area as the thoracic area. Panuska concluded by testifying that while it was unlikely applicant's shoulder injury could get 100% better, he could improve over time with more therapy, but at that moment, applicant could not do his job.

Applicant was then called to the stand to continue testifying. Applicant admitted that he had not been doing any physical therapy since the latest MRI. He had last undergone physical therapy in December 2004 but had to stop due to the pain. He tried to do some home rehabilitation after the surgery, but stopped because the pain was too great. Applicant described his injury as two distinct periods: injury to surgery, and surgery to the present. Between his initial injury and the surgery, he was not having the range of motion problems he was experiencing now. He was able to get his arm above his head (albeit painfully). He always, however, had persistent pain under left shoulder and limited lifting capacity. Rehabilitation efforts made it worse. After the surgery, he had severe range of motion problems with his left arm and shoulder.

The Board then cross-examined applicant over the photo of him snorkeling on vacation in

4

2004 prior to the surgery. The Board produced a photo of applicant on vacation, head out of water, appearing to raise his right hand. Applicant argued that it was his right hand that was above the water in the photo, not the left. The issue was left somewhat unresolved and the photo was entered into evidence.

The Board next confronted applicant over his surgery cancellations in 2004. The Board contended that a nurse at the hospital where the surgery was to be performed had written down that workers' compensation had approved the surgery in June but that applicant did not return the nurse's call because he was out of town and cancelled surgery due to his inability to find a ride. Applicant disputed the nurse's version, saying that his lawyer and workers' compensation nurse were saying the surgery was not approved. Applicant noted that, up to the present day, the surgery bill has not been paid by workers' compensation.

The Board also cross-examined applicant on his income and net worth. After much back and forth, applicant admitted he made, on average, depending on how much his part-time job required him to work, $1,000 a month. He has $10,000 in the bank from the sale of his house.

At the hearings, various exhibits provided by the Board and applicant were admitted into evidence. Among the Board's exhibits were applicant's functional capacity evaluation of March 1, 2004, conducted at Riverside HealthCare Clinic, which indicated that he was a potentially excellent candidate for rehabilitation, but that he did not magnify his symptoms and gave full physical effort during the exam. Also entered by the Board was a letter from Dr. Goldberg on April 9, 2004, noting that an MRI revealed either a full-thickness or near-full-thickness rotator cuff tear, and that the applicant had two decisions: either to live with the injury (in which case he is at maximum medical improvement and will likely not get better) or have surgery to repair the injury (in which case he

5

would need extensive therapy, but after six months or so could possibly resume being a fireman). Goldberg also commented that he believed applicant's current injuries were related to the accident on December 2, 2003.

Also included were reports from three doctors selected by the Board to review applicant's case. The first, by Dr. Terrence Moisan, dated December 15, 2004, stated that applicant should be able to recover after the surgery. Moisan was also "perplexed as to the relationship of his shoulder to the work injury" because the symptoms of left infrascapular pain did not seem to be related to the shoulder. Nevertheless, whatever the cause of the injury, applicant was at the time incapable of performing his duties as a firefighter. The second, by Dr. Joseph G. Thometz, dated December 16, 2004, found the applicant had left shoulder and scapular pain and was not capable of returning to his job as a firefighter. Further, the current medical condition was a result of his work-related injury from December 2, 2003, and that his current cause of disability was limited range of motion and strength for the left shoulder. The third report, from Dr. William C. Malik, dated February 4, 2005, found that applicant's current medical condition was a result of the injury suffered on December 2, 2003, and that he was disabled from full duty as a firefighter due to the failed rotator cuff surgery.

The Board issued its decision on December 14, 2005. The following "Findings of Fact" were made by the Board:

"According to Dr. Panuska, there was no initial evidence of a shoulder injury; his diagnosis was a strain of the upper back. It was also Dr. Panuska's opinion that at the time of the hearing, full recovery of Mr. Roszak is difficult to predict for three reasons:

6

(1) lack of aggressive post-surgery rehabilitation;

(2) the length of time from the surgery;

(3) presence of atrophy of the muscles.

According to Dr. Panuska, after his initial examination of the applicant, he recommended aggressive rehabilitative treatment, which did not occur. Dr. Panuska also testified that when he first examined the applicant, he had full range of motion in the left shoulder. On cross-examination, Dr Panuska indicated that Mr. Roszak did not avail himself to rehabilitative treatment and therapy in order to obtain maximum rehabilitation to effect recovery.

After Dr. Panuska testified, the applicant admitted that he only tried physical therapy on three occasions, but could not complete the physical therapy sessions. The applicant further testified that his last physical therapy session was December 9, 2004, about two months after he filed his application for a disability pension. The applicant also indicated that he did not begin any rehabilitation with a physical therapist at until twelve to eighteen weeks after his shoulder surgery.

Mr. Roszak stated that he cannot lift his arm above his shoulder and is always in great pain. However, his physical therapy report showed that he tolerated therapy and pain rather well. The evidence introduced at the hearing also indicated that according to Mr. Roszak's own website, [h]e was able to go snorkeling in Cancun, without a problem. Board Exhibit M shows Mr. Roszak waving to the camera while snorkeling. However, according to the applicant, he cannot identify himself in the picture.

The Pension Board selected Dr. Terrence C. Moisan to conduct an independent medical examination (IME) in this case. In his report, Dr. Moisan states that he is perplexed as to the relationship of Roszak's shoulder injury to the work injury. Dr. Moisan also indicated that the applicant will improve substantially if he would continue therapy with his treating physician, Dr. Goldberg. Dr. Moisan indicated after reviewing the MRI that there was surgical success in treating the injury. Dr. Moisan also stressed in his latest report as to the importance of the applicant undergoing further physical therapy and work hardening. According to this report, the latest MRI would not be inconsistent with Roszak's ability to return to work.

\*\*\*

In a subsequent report, Dr. Thometz states that the applicant's latest MRI report did not show evidence of a recurrent or residual rotator cuff tear. Despite the lack of objective findings above, Dr. Thometz indicates that the cause of disability is limited range of motion and strength in the left shoulder. This subjective determination is based upon what the applicant told this physician.

The third physician conducting an MRI for the Pension Board was Dr. William Malik. Dr. Malik describes the applicant's condition as a failed rotator cuff surgery. In a supplemental report, Dr. Malik concludes that Roszak suffers from 'tendinopathy of the supraspinatus tendon without a discrete tear identified, surgical repair noted.' Dr. Malik concludes that Roszak is permanently disabled.

The medical documentation admitted into evidence in this case is in dispute

8

as to what Mr. Roszak's physical condition is and what caused the condition.

The applicant testified at the first hearing that he was not being allowed to see his treating physician because his bills were not being paid and he has not been able to see his treating physician since January of 2005. He also claimed at the initial hearing that his surgery was denied for nine months and he does not know why. However, according to applicant's Exhibit 2, the surgery was cancelled because Mr. Roszak was out of town on vacation and he did not return the doctor's phone calls.

During the hearing, the applicant was evasive and at times refused to answer questions proffered by the Board. For example, he initially refused to give a residence address, he refused to state what he is currently earning, and refused to answer questions as to his net worth.

Mr. Roszak testified that he is in constant pain, but cannot and has not seen any treating physician for months.

Based upon the applicant's evasive testimony and lack of candor, the Board concludes that the applicant was not a credible witness."

The Board then conducted its analysis of whether the applicant was disabled. The Board found that the applicant was not disabled. The Board concluded that applicant's lack of credibility adversely impacted his claim that he was disabled for a number of reasons. The Board found he was evasive in answering questions about where he lived and worked and what he earned. The Board also believed that applicant magnified his symptoms. As evidence of this, it pointed to his snorkeling vacation, surgery postponements, and failure to see a doctor in months. It also believed that he

9

exacerbated his injuries by not, as Dr. Panuska suggested, seeing a doctor for months after the surgeries. Although applicant blamed this on workers' compensation and affordability issues, the Board did not find applicant credible and pointed to his assets in the bank. The Board also pointed to Dr. Panuska's testimony regarding applicant's full range of motion in the January 2004 examination and the conclusion by Dr. Goldberg that the surgery was successful. The Board concluded that if the injury was as serious as applicant contended, he would have taken reasonable medical steps to promote recovery. Finally, the Board cited medical evidence to support its position, such as Dr. Panuska's January 2004 findings that the applicant had full range of motion in his arm, Goldberg's proclamation of successful surgery, and the reports of the Board-appointed examining physicians who concluded that the surgery had repaired the injury. The Board also discounted those same appointed physicians who determined that applicant was still disabled because that was based on their subjective determinations of what the applicant, whom the Board declared not credible, had told them.

In the alternative, even if it were to conclude that applicant was disabled, the Board determined that applicant would still not be entitled to disability because he had not taken the reasonable steps to rehabilitate his shoulder after surgery.

Following the Board's decision, applicant appealed to the circuit court of Kankakee County. The circuit court affirmed the Board's decision, and applicant now appeals to this court.

ANALYSIS

On appeal, applicant contends that the decision of the Board denying him disability benefits was against the manifest weight of the evidence. In support of this contention, applicant argues that all of the medical opinion of record indicated he was disabled from his duties as a firefighter due to

10

an injury suffered on the job and thus the Board's decision was wrong. The Board argues that there was medical evidence showing that applicant was not disabled. Further, the Board argues that even if applicant were determined to be disabled, he was not entitled to disability pay because he failed to take reasonable steps to remedy his condition as required by the Workers' Compensation Act (820 ILCS 305/1 et seq. (West 2006)).

When deciding an appeal from a judgment in an administrative review proceeding, the appellate court reviews the administrative agency's decision, not the trial court's decision. Harroun v. Addison Police Pension Board, 372 Ill.App.3d 260, 261-62, 865 N.E.2d 273, 275 (2007). "Rulings of law are reviewed de novo, but the agency's findings of fact will be upheld unless [they are] against the manifest weight of the evidence." Harroun, 372 Ill.App.3d at 262, 865 N.E.2d at 275. An administrative agency's decision on a mixed question of law and fact will only be reversed if the decision was clearly erroneous. Harroun, 372 Ill.App.3d at 262, 865 N.E.2d at 275.

The Board's decision will be reversed only if it was against the manifest weight of the evidence. The applicant has the burden of proving that he was entitled to the disability pension. Evert v. Board of Trustees of the Firefighters' Pension Fund of the City of Lake Forest, 180 Ill.App.3d 656, 661, 536 N.E.2d 143, 146 (1989). "'[A]n administrative agency[']s decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident.'" Thigpen v. Retirement Board of Fireman's Annuity and Benefit Fund of Chicago, 317 Ill.App.3d 1010, 1017, 741 N.E.2d 276, 281 (2000). The reviewing court must not substitute its own judgment for that of the administrative agency and should affirm the agency's decision if the record contains evidence to support the agency's findings. Thigpen, 317 Ill.App.3d at 1017, 741 N.E.2d at 281. "It is not sufficient that there are mere conflicts in the testimony or that an opposite conclusion might be

reasonable; since the weight of the evidence and the credibility of the witnesses are within the province of the agency, there need be only some competent evidence in the record to support its findings. Evert, 180 Ill.App.3d at 660, 536 N.E.2d at 146.

The provisions governing firefighters' pensions must be liberally construed in favor of the applicant. Thigpen, 317 Ill.App.3d at 1017, 741 N.E.2d at 281. In order for an active fireman to be entitled to duty disability benefits, he must establish: (1) that he is disabled; and (2) that his disability was caused by an injury incurred in or resulting from an act of duty. 40 ILCS 5/6-151 (West 2006); Thigpen, 317 Ill.App.3d at 1017, 741 N.E.2d at 281-82.

Disability is defined as:

"A condition of physical or mental incapacity to perform any assigned duty or duties in the fire service." 40 ILCS 5/6-112 (West 2006).

An act of duty is defined as:

"Any act imposed on an active fireman by the ordinances of a city, or by rules or regulations of its fire department, or any act performed by an active fireman while on duty, having for its direct purpose the saving of the life or property of another person." 40 ILCS 5/6-110 (West 2006).

Further, when a firefighter applies for benefits, the Pension Code provides: "Proof of duty, occupational disease, or ordinary disability shall be furnished to the Board by at least one licensed and practicing physician appointed by the Board." 40 ILCS 5/6-153 (West 2006).

Before granting a disability benefit, the Board must receive proof that the applicant is disabled from at least one physician appointed by the Board. Thigpen, 317 Ill.App.3d at 1018, 741 N.E.2d at 282.

In the instant case, there is no dispute that the injury in question arose during the course of applicant's active duty as a fireman. He was helping a 300- to 400-pound woman onto a stretcher after an emergency call when he felt a pain in his shoulder and back. What is at issue, however, is whether that accident caused him to become disabled so as to be eligible for disability benefits under the pension statute.

The Board's analysis in that regard is problematic. Several of the Board's crucial findings used to deny applicant's disability were against the manifest weight of the evidence. We will address each finding in turn. First, the Board cites what it believes to be applicant's credibility problems. In support of this contention, the Board lists four instances where it believes applicant was being less than truthful and thus destroyed his credibility with the Board.

The first instance cited by the Board is the applicant's "evasiveness" in responding to questions about where he lived, where he worked, what he earned, and his current net worth. We find that the applicant's answers to those questions, while at times seemingly evasive, do not impact on the applicant's veracity concerning his injury. We first note that these issues were tangential at best to the issue before the Board, namely, whether applicant was disabled from the injury. With regard to his current address, the following exchange was had between applicant and the Board:

"MR. PUCHALSKI: Just one other question. What is your current resident address?

THE WITNESS: As I said, I don't have a permanent resident address at this time.

MR. PUCHALSKI: Well, you have to be living somewhere.

13

THE WITNESS: Well, I've been staying with my mom and family members and my sister. P.O. Box 1881, Kankakee, Illinois.

MR. PUCHALSKI: Okay. You don't live in a P.O. Box. What I'm asking you is, what is your resident address? Where are you residing as we sit here today?

THE WITNESS: I don't have a permanent address.

MR. HARMON: Where do you sleep at?

THE WITNESS: I can sleep with my mom or my sister or my friends or my nephews.

MR. PUCHALSKI: Okay, my question is, as we sit here today, where are you staying? Where are you living? Where are you residing?

THE WITNESS: And I just told you, I'm residing with friends and family members.

MR. PUCHALSKI: Well, give me the address is all I'm asking. I don't know why this is such a big deal.

THE WITNESS: I don't know why it is either. My address is P.O. Box 1881, Kankakee, Illinois. If you need to write me a letter, that's where I can get it.

MR. PUCHALSKI: Is there a reason why you don't want to tell us where you're residing?

THE WITNESS: No. I don't have any money coming in right now. I don't have money to buy an apartment or anything like that. Would you like my mom's address? Is that what you're asking?

MR. PUCHALSKI: I'm asking you where you are living today as we speak. Where did you get up and get dressed?

14

THE WITNESS: 501 Stoney Ridge Court.

MR. PUCHALSKI: 501 Stoney Ridge Court.

THE WITNESS: Valparaiso, Indiana, 46385.

MR. PUCHALSKI: And that was your abode as of today?

THE WITNESS: That's my mother's address.

MR. PUCHALSKI: Okay. But that's not what I'm asking you. And the only reason – you know, I think – and Counsel, correct me if I'm wrong. Anytime I've ever tried one of these cases in court and you ask somebody where they live, they give you their address. And all I'm asking is, if you are not living with your mother, where are you living? Did you wake up there today?

THE WITNESS: Yes, I did.

MR. PUCHALSKI: Okay. So you were at your mother's house in Valparaiso, Indiana. You slept there last night and that's where you left to come here?

THE WITNESS: Yes.

MR. PUCHALSKI: Okay. All right. I have nothing further."

What the exchange between the Board and the applicant demonstrated is that the applicant was "between residences." He had sold his house and was bouncing around between friends and family. He readily provided the Board with a post office box address to get in touch with him. When the Board finally narrowed down the question, he readily provided them with his mother's address. He had no "permanent residence" in the traditional sense of the phrase. Still, this exchange does not appear to exhibit willful obstructionism or evasiveness on the applicant's part. Rather, it points more

15

to confusion between the parties as to what was being asked. Applicant provided a post office box, and when the Board specified what it wanted, he readily provided his mother's address.

Next, the Board argues that the applicant's evasiveness in answering where he worked, what he earned, and what his net worth was damaged his credibility. Again, this interpretation does not hold up under a close examination of the record. In all of these instances, the applicant eventually provided the Board with the answers it desired. As to where applicant currently worked, the Board does not cite specifically how applicant was evasive on this subject. He answered all the Board's questions, revealing where and for whom he worked. With regard to his income, the applicant at first did not understand why the Board wanted to know how much money he made. After much back and forth between applicant's attorney and the Board, applicant stated he did not know how much money he made as he was a part-time employee with no set or guaranteed hours per month. Eventually, applicant stated he made around $1,000, but again, it was an estimate on his part as he had no full-time regular job. The Board then inquired about applicant's net worth, and after some initial confusion and back and forth between applicant, his attorney, and the Board, applicant stated his net worth was around $15,000. Applicant's attorney at times questioned the Board's need to know applicant's net worth, which may have contributed to applicant's seeming reluctance to provide definitive answers to the Board's questions. What all of these examples cited by the Board as adversely affecting applicant's credibility have in common are that they do not directly relate to applicant's disability stemming from the December 2, 2003, injury. Further, the Board was not always clear or direct in conveying to applicant just what it was the Board wanted to know. Finally, in every circumstance, the applicant eventually did provide the Board with an answer. We cannot say that these examples cited by the Board resulted in damage to applicant's credibility as to his disability.

16

Second, with regard to applicant's credibility, the Board cited what it termed the applicant's "symptom magnification." As an example, the Board cites applicant's testimony that he was in constant pain and needed surgery, yet postponed surgery to go on a snorkeling vacation. This is simply not supported by any document or testimony in the record. What the record does show is that applicant postponed surgery in May and June 2004 due to uncertainty over whether workers' compensation would pay for the surgery. It appeared applicant was being told by a nurse working with Dr. Goldberg that the surgery had been approved, while his attorney and workers' compensation nurse were telling him it was not approved. During applicant's testimony, the Board itself identifies the snorkeling vacation as having taken place in February 2004. According to the medical records, Dr. Goldberg's first meeting with applicant was not until April 9, 2004, a full two months after the snorkeling trip. There is no evidence for the Board's assertion that applicant canceled surgery dates to go snorkeling. It appears that the Board has conflated the surgery cancellations with the snorkeling trip.

The third and fourth factors cited by the Board in assessing applicant's credibility were his failure to see a doctor for months while being in constant pain and his delay in seeking rehabilitation after surgery. The Board contends that if the injury were as serious as applicant maintains, he would have taken reasonable medical steps to promote recovery. Applicant's testimony has refuted the Board's assertions. First, applicant testified that he did continue therapy at home, doing various exercises. Second, he was reluctant to continue with the physical therapy when, in applicant's mind, it was not working and his condition was not improving. Third, and most important, applicant stated that workers' compensation would not pay for the rehabilitation. The Board contends that applicant could pay for the rehabilitation out of his own funds. Applicant already established, however, that

17

his own net worth was limited. Workers' compensation, from his testimony, should have been paying for the rehabilitation. At the time of the hearing, he was engaged in litigation with his workers' compensation claim over paying his medical bills. We find that these responses to the Board's questioning do not detrimentally affect applicant's credibility, as his rehabilitation was causing him intense pain, and once workers' compensation stopped paying the bills, he did not spend his finite resources on further rehabilitation while litigating his workers' compensation claim.

Once the Board had determined that applicant lacked credibility, it used its determination to discount the medical opinions of Doctors Thometz, Moisan, and Malik. Dr. Moisan, in his December 15, 2004, report after examining applicant, was perplexed by the relationship between the shoulder injury and the work injury, but noted that a small tear could have occurred and masked the pain. He then wrote, "[w]hatever the cause of the left shoulder injury, he is currently impaired for firefighter activities due to pain limited elevation and external rotation of the shoulder." In his December 16, 2004, report, Dr. Thometz concluded that applicant was "not capable of returning to his job as a fire fighter for the Kankakee Fire Department" and that applicant's "current medical condition is a result of his work related injury from 12/2/03 while he was lifting a patient in his duties as a fire fighter." Dr. Malik on February 4, 2005, wrote, "I do believe that Andrew Roszak is disabled from full duty as a firefighter for the Kankakee Fire Department" and that "the current medical condition is the result of the described injury that occurred in December of 2003." The Board, however, has discounted these medical opinions, because "[t]he physicians who determined that Mr. Roszak is still disabled, based their findings on what the applicant told them and on subjective determinations. If the applicant was not truthful with this Board, we can assume that he was not truthful with the Board's examining physicians."

18

With regard to medical diagnosis and/or treatment, doctors have relied in part on the subjective complaints of their patients and have been allowed to testify concerning those statements. When it comes to treating physicians, statements describing medical history, past or present symptoms, pain, or sensations are admissible as an exception to the hearsay rule if made to the physician for purposes of medical diagnosis or treatment. See Melecosky v. McCarthy Brothers Co., 115 Ill.2d 209, 214, 503 N.E.2d 355, 357 (1986); see also Greinke v. Chicago City Ry. Co., 234 Ill. 564, 570, 85 N.E. 327, 330 (1908). The reasoning behind this exception is based on the assumption that patients tell their doctor their true condition of well-being and have no motive to falsify. Greinke, 234 Ill. at 572, 85 N.E. at 330. When it comes to examining physicians, however, evidence of such statements are not admissible under the hearsay exception if made to the physician for the purpose of testifying. Melecosky, 115 Ill.2d at 214, 503 N.E.2d at 537; Greinke, 234 Ill. at 571, 85 N.E. at 330. Here, applicant's statements to the various physicians were done for purposes of medical diagnosis or treatment.

In the instant case, the Board's doctors' medical opinions and diagnoses have been supported by the other medical testing, *e.g.* their physical examinations of applicant and the results of the MRI. The MRI revealed the postsurgical state of applicant's shoulder, and all the doctors noted in letters from June 2005 that applicant would need further rehabilitation. Dr. Malik even concluded that applicant was permanently disabled. We have already determined that the Board's assessment of applicant's credibility was against the manifest weight of the evidence. Therefore, the Board's discounting of the doctors' reports based on applicant's suspect credibility was in error. The Board's decision to dismiss the objective findings of its appointed doctors was against the manifest weight of the evidence.

19

Next, the Board turns to Dr. Goldberg's claim that the surgery was a success as proof that applicant was no longer disabled. We find this characterization by the Board to be in error. At no place in the documentation after the August 31, 2004, surgery does Dr. Goldberg explicitly refer to the surgery as a "success." Further, Dr. Goldberg's November 2004 report of his postoperation examination of applicant revealed that applicant still had a long way to go before he could be fully recovered. The Board has mischaracterized the use of the term "success" as meaning no disability or that Dr. Goldberg believed the patient to be fully healed. The evidence in the record does not support that interpretation.

Finally, the Board cites as medical evidence Dr. Panuska's statement from January 29, 2004, that applicant had full range of motion in his arm as evidence of no disability. This is problematic on a couple of levels. First, at no place in the record is there any documentation showing that Dr. Panuska examined applicant on January 29, 2004. In fact, Dr. Panuska had by that time referred applicant to Dr. Charuk. The "Functional Capacity Evaluation Summary Report" dated March 1, 2004, indicates that applicant was being seen by Dr. George Charuk from January 21, 2004, to February 10, 2004, after being referred by Dr. Panuska. Further, there is a "Work Status Report" exam of applicant signed by Dr. Charuk dated January 28, 2004, along with rehabilitation services reports dated January 27, 2004, and January 30, 2004, from the Riverside Medical Center, with Dr. Charuk listed as the attending physician. There is no evidence in the record that applicant saw Dr. Panuska between those dates.

There is a record of a December 29, 2003, examination by Dr. Panuska that found that applicant had full range of motion but pain in his extremities. Dr. Panuska's records from that time, however, do not show that applicant was not disabled. It should be remembered that Dr. Panuska

20

saw applicant in the days immediately after the accident. He also admitted on cross-examination that the thoracic area where he diagnosed applicant's strain on December 3, 2003, also covered the scapula area, which was the shoulder blade. Panuska admitted that it was not farfetched to believe that the shoulder blade had been involved from the initial time when it covers the same area as the thoracic area. After referring the patient to Dr. Charuk, Dr. Panuska lost track of the case. Further, the medical report from January 5, 2004, indicated that applicant did at that time have full range of motion, but that as the days went on, applicant began experiencing more pain.

After examining the record, and comparing the record with the findings of fact issued by the Board, we come to the conclusion that those findings relied upon by the Board in denying disability to applicant were against the manifest weight of the evidence. We find that, based on the testimony and documentation in the record, applicant has carried his burden and shown that he was disabled at the time of the hearing as a result of the December 2, 2003, injury incurred in the course of his duty as a Kankakee firefighter.

As we have determined that applicant properly established his disability, we must turn to the Board's argument that applicant is still not entitled to disability pay because he failed to take reasonable steps to remedy his condition. In support of this contention, the Board argues that under the Workers' Compensation Act, failure to undergo required rehabilitation can become a superseding cause of disability and, thus, it was applicant's failure to pursue rehabilitation aggressively enough, not the original injury, that caused his disability. Applicant counters that the Workers' Compensation Act does not apply in Pension Code cases. In the alternative, applicant argues that even if the Pension Code allowed for loss of benefits for refusal of medical treatment that would resolve the disability, that penalty would not be applicable given the instant facts.

21

The two statutes at issue are the Workers' Compensation Act (hereinafter the Act) and the Illinois Pension Code (hereinafter the Code). The relevant portion of the Act states:

> "If any employee shall persist in insanitary or injurious practices which tend to either imperil or retard his recovery or shall refuse to submit to such medical, surgical, or hospital treatment as is reasonably essential to promote his recovery, the Commission may, in its discretion, reduce or suspend the compensation of any such employee." 820 ILCS 305/19(d) (West 2006).

There is no comparable provision in the Code.

Illinois courts have dealt with issues of rehabilitation and claims filed under the Act and the Code. Two early cases were from the Illinois Supreme Court, Joliet Motor Co. v. Industrial Board of Illinois, 280 Ill. 148, 117 N.E. 423 (1917), and Mt. Olive Coal Co. v. Industrial Comm'n, 295 Ill. 429, 129 N.E. 103 (1920). In Joliet, a worker who injured his eye in the course of his work sought workers' compensation. Although doctors recommended operation with a 75% chance of full recovery, the employee refused surgery. Joliet, 280 Ill. at 149-50, 117 N.E. at 424. Our supreme court held the refusal of medical treatment constituted the sole operative cause of the claimant's condition, so claimant was not entitled to compensation. Joliet, 280 Ill. at 151, 117 N.E. at 424. In Mt. Olive, an employee who broke his arm during work refused to undergo a safe and simple procedure that would have corrected the problem. Mt. Olive, 295 Ill. at 430-31, 129 N.E. at 104. The supreme court held that the accident entitled the employee to an award of temporary total disability under the Act, but that the permanent disability award to the employee was in error, because the permanent disability resulted from his refusal to submit to the operation as opposed to the original accident. Mt. Olive, 295 Ill. at 433, 129 N.E. at 105.

22

The interpretation of the Act from the Mt. Olive and Joliet cases was applied by an appellate court to the Code in Mulack v. Hickory Hills Police Pension Board, 252 Ill.App.3d 1063, 625 N.E.2d 259 (1993). In Mulack, a police officer injured his knee chasing a suspect, and with one doctor recommending operating on the knee and another doctor recommending physical therapy, the pension board awarded the officer temporary disability but required him to undergo surgery before it would award permanent disability. Mulack, 252 Ill.App.3d at 1067, 625 N.E.2d at 262. The officer refused surgery and stayed in physical therapy, prompting the board to terminate his disability payments after it found that the refusal of surgery caused the disability to continue. The Mulack court began by noting that although the Code lacked any provision comparable to section 19(d) of the Act, it found the Joliet and Mt. Olive cases applicable to a determination of whether a duty injury resulted in a claimant's disability under the Code. Still, the court held that the record did not support the board's finding that the officer refused surgery unreasonably and in light of the conflicting medical opinions, ordered the payment of the disability benefits. Mulack, 252 Ill.App.3d at 1071, 625 N.E.2d at 265.

More on point with the facts before this court in the instant case is Luchesi v. Retirement Board of the Firemen's Annuity & Benefit Fund of Chicago, 333 Ill.App.3d 543, 776 N.E.2d 703 (2002). In that case, a firefighter was denied a disability pension following an on-the-job accident because the firefighter refused to undergo physical therapy following shoulder surgery. The pension board claimed that the firefighter's failure to perform physical therapy constituted an intervening cause, breaking the causal connection between the initial shoulder injury and the disability. Luchesi, 333 Ill.App.3d at 544-45, 776 N.E.2d at 705.

The Luchesi court agreed with Mulack that Joliet and Mt. Olive guide the interpretation of

23

whether a claimant's disability resulted from an act of duty within the meaning of the Code. Luchesi, 333 Ill.App.3d at 553, 776 N.E.2d at 712. However, in those cases the evidence supported the conclusion that if the claimant had undergone the recommended surgery, he would have regained use of his injured part so that he could fully return to work. Luchesi, 333 Ill.App.3d at 553, 776 N.E.2d at 712. In Luchesi, on the other hand, the doctor testified that he could not determine the likely result if the firefighter had kept going to therapy. The court noted that if the firefighter had sought compensation under the Act, rather than benefits under the Code, his failure to follow through with physical therapy would have qualified under section 19(d) for the reduction or suspension of compensation. Luchesi, 333 Ill.App.3d at 554, 776 N.E.2d at 713. But, the court went on, failure to follow through with the therapy does not warrant the denial of individual compensation altogether, because the evidence did not show that the refusal of treatment counted as the sole cause of his condition. Luchesi, 333 Ill.App.3d at 554, 776 N.E.2d at 713.

The Luchesi court stated that the Code "differs markedly" from the Act by the absence of any provision similar to section 19(d). Luchesi, 333 Ill.App.3d at 554, 776 N.E.2d at 713. From the use of different provisions, the court presumed that the legislature intended different results to follow because the legislature sought to provide greater protections to firefighters and police officers than those provided in the Act for other kinds of employees. Luchesi, 333 Ill.App.3d at 554, 776 N.E.2d at 713. The court noted that the Code left injured firefighters and officers with full disability benefits, even if they refused medical treatment. Luchesi, 333 Ill.App.3d at 555, 776 N.E.2d at 713. Mulack identified a qualification of the general rule: if the refusal of treatment rises to the level of a superseding cause of continuing disability, then the Code permits denial of benefits. But where, as in Luchesi, the record lacked evidence that the claimant would have recovered the ability to work as

24

a firefighter or police officer if he had all recommended treatment, the refusal constitutes only one of several causes of continuing disability. The court concluded by holding, in accord with the legislative intent to provide greater protection for police and firefighters, absent proof that the firefighter would have fully recovered if he had all recommended treatment, his refusal of treatment does not justify any reduction in benefits under the Code. Luchesi, 333 Ill.App.3d at 555, 776 N.E.2d at 713.

We find the reasoning and analysis employed by the court in Luchesi sound and adopt it to guide our own analysis in the present case. There is evidence in the record, such as the June 2005 reports of Drs. Thometz and Moisan that further improvement of applicant's shoulder would require further physical rehabilitation. That is also the opinion of Dr. Panuska. However, another doctor, Dr. Malik, stated in his June 27, 2005, letter, that applicant was permanently disabled. Further, applicant did state that he had undergone some physical therapy, such as home exercises, after the surgery, but had to discontinue the therapy due to increased pain and, most importantly, the failure of workers' compensation to pay the medical bills. Also, there is no definitive statement from any of the doctors that examined applicant postsurgery that applicant's failure to continue with the therapy had become a superseding cause of the disability, but rather, as the doctors' indicated, it may have been just one cause of several, such as the original accident, that contributed to applicant's continuing disability. See Luchesi, 333 Ill.App.3d at 555, 625 N.E.2d at 713. Dr. Panuska himself, on whom the Board placed much of the basis for its decision, admitted during questioning that it was unlikely applicant would improve 100%, even with rehabilitation. Therefore, we find the Board was in error when it denied applicant disability benefits because he had not pursued physical therapy aggressively enough. The evidence in this case indicates that the failure to aggressively pursue

25

rehabilitation was not a superseding cause of his continuing disability.

The decision of the Board denying disability benefits to applicant, who was injured in the line of duty, was against the manifest weight of the evidence. Also, the Board erred when it denied him benefits when it decided he had not pursued physical therapy aggressively enough. The decision of the Board that the applicant failed to take reasonable steps to remedy his condition is against the manifest weight of the evidence. Applicant met his burden to prove he is disabled from his duties as a firefighter due to a job-related injury and thus entitled to disability benefits. The decisions of the circuit court and Board are reversed and the case is remanded to the Kankakee Firefighters' Pension Board with direction to enter an order granting the application for line of duty benefits and any other relief to which the applicant is entitled.

Reversed and remanded.

LYTTON, P. J. and MCDADE, J. concurring.