2025 IL App (1st) 241278
No. 1-24-1278
Order filed July 25, 2025

Sixth Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| NICHOLAS WITTEMAN, | ) | Appeal from the Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 23 CH 08645 |
| BROOKFIELD FIREFIGHTERS' PENSION FUND and THE BOARD OF TRUSTEES OF THE BROOKFIELD FIREFIGHTERS' PENSION FUND, | ) ) ) | The Honorable Thaddeus L. Wilson, |
| | ) | Judge, presiding. |
| Defendants-Appellees. | ) | |
| | ) | |

JUSTICE HYMAN delivered the judgment of the court.
Justices C.A. Walker and Gamrath concurred in the judgment.

**ORDER**

¶ 1     *Held*: Pension board decision denying a line of duty pension and granting a non-duty pension was not against the manifest weight of the evidence.

¶ 2     Nicholas Witteman, a firefighter for the Village of Brookfield Fire Department, applied for a line of duty disability pension, claiming he had injured his back while helping lift an overweight patient. After a hearing, the Board of Trustees of the Brookfield Firefighters'

Pension Fund found Witteman disabled, but his injury was not work-related. In a 66-page decision, the Board cited inconsistencies in his testimony regarding the incident, including (i) failing to report the injury to coworkers, (ii) amending his application describing how the injury occurred, and (iii) his demeanor at the hearing. Conversely, the Board found the testimony of the firefighter witnesses, although conflicting, to be credible and supported the finding that Witteman's injury did not occur as he claimed. In a 3-1 vote, the Board denied a line-of-duty pension but unanimously approved a non-duty pension. The circuit court upheld the Board's decision.

¶ 3        On appeal, Witteman contends that the Board erred by (i) not resolving all the conflicts in his coworkers' testimony, (ii) finding that he failed to report his injury timely, (iii) making an adverse inference about his credibility based on amending his disability application, (iv) manipulating expert medical testimony to reach its desired result, and (v) relying on his demeanor at the hearing in assessing his credibility.

¶ 4        We affirm. The Board was not required to resolve every inconsistency in the witness's testimony, nor barred from considering Witteman's amended disability application or his demeanor in assessing his credibility. Witteman's remaining contentions—that the Board found he delayed reporting his injury and manipulated expert medical testimony—lack merit. Determining the cause of Witteman's injury, based on the evidence and testimony, was squarely within the Board's authority and was not against the manifest weight of the evidence.

¶ 5                                    Background

¶ 6        Witteman joined the Department as a firefighter/paramedic in July 2010. On April 14, 2020, he and his partner responded to an ambulance call at a single-family residence. Three other firefighters responded, too. The patient, an elderly, overweight man with limited mobility, asked

the firefighters to take him to the hospital. To do so, the man needed to be moved from a reclining chair onto a stretcher. Witteman claimed that while lifting the patient's upper body out of the chair and placing him on the stretcher, he felt a sharp pain in his lower back.

¶ 7        Witteman said his back pain worsened overnight and into the following day. His physician referred him to an orthopedic surgeon, and he eventually underwent two back surgeries. His pain persisted, and he has not returned to regular firefighting duties. He applied for a line-of-duty disability pension, stating that he injured his back "transporting a large patient from chair onto a cot, felt sharp pain in lower back."

¶ 8                                        Board Hearings

¶ 9        The Board held hearings regarding Witteman's disability application on May 13, 2022, and April 13, 2023. Board Trustee Charles Romeo, who was present when Witteman allegedly injured his back, recused himself. Before testimony began, the Board asked if Witteman wished to amend his application to include a non-duty disability pension as an alternative. His attorney said he did.

¶ 10                                        Witteman Testimony

¶ 11        Witteman testified that early in his 24-hour shift on April 14, 2020, he and his partner, Brad Pacyga, responded to a call at a single-family home with a wheelchair ramp. The patient, who had paraplegia with diabetes, weighed between 350 and 400 pounds. A second ambulance, with firefighters Charles Romeo and Mark Pollard, and a fire truck driven by Matthew Dubik also responded. The team was familiar with the patient and anticipated needing extra help due to his weight and health condition.

¶ 12        To transfer the patient from a reclining chair to a stretcher, they performed a "trunk lift": one firefighter lifted the patient's upper body while others moved his legs, sometimes using a bed sheet. Witteman said he was positioned at the patient's head. As he placed his arms under the

patient's armpits and lifted and twisted to lower him onto the stretcher, he felt a sharp pain in his lower back. The pain continued as they wheeled the patient down the ramp and over uneven ground. Witteman said he bore most of the weight because of his positioning and felt every bump. Lifting the stretcher over a curb and lowering it to the street was "incredibly painful." The ambulance's mechanized lift then loaded the patient. Witteman drove, while Pacyga remained in back with the patient.

¶ 13        The pain persisted throughout the drive and worsened when transferring the patient from the stretcher to the hospital bed. Witteman did not cry out or show signs of pain, explaining that he has a high pain tolerance and was focused on the patient. He did not tell his coworkers that he was injured. After the call, he and Pacyga returned to the fire station, but Witteman did not inform the lieutenant on duty or anyone else during the remainder of the shift that he had hurt his back.

¶ 14        To further explain his failure to report his injury, Witteman said "[a]t the time I was not talking to my lieutenant, nor my other shift mate due to very disparaging things that they had said and/or done to me." He described Lieutenant Dubik as one of "the most despicable people in the world," and he did not think he could trust or talk to Dubik or Pacyga. He said the dispute arose when Dubik and Pacyga told the fire chief that he was not eating meals with his fellow firefighters and needed a psychological evaluation. This dispute prompted him to ask for a shift change, which was pending at the time.

¶ 15        Witteman could not remember what he did the rest of his shift but acknowledged he went on at least two more calls. He was able to perform his job duties because the calls were not physically demanding. He said the pain continued to increase overnight; he had muscle spasms and was unable to sleep. He did not tell anyone about his injury until the next morning, when Lieutenant Kloss saw him stretching out his back on the floor and asked him what happened.

¶ 16    After his shift ended, Witteman went home. A few hours later, he called Fire Chief James Adams to tell him he had injured his back. Witteman said Adams told him to rest and "do what you guys normally do," but did not tell him to seek medical treatment. Witteman said he wasn't sure what to do. When the pain did not subside, he called in sick for his next shift. He tried to see a doctor but was unable to get an appointment until a week later. He went to his own doctor rather than the Department's occupational health clinic because he said it was closed due to the COVID-19 pandemic. After seeing his doctor, Witteman went to the fire station and filled out "Form 45" to report his injury, so-called because it must be filed within 45 days of an injury.

¶ 17    About five years earlier, Witteman had injured his back when lifting a patient who got stuck behind a hot water tank. After physical therapy, he returned to full duty. He acknowledged that although that injury was much less painful, he immediately informed his coworker about it and submitted a Form 45 on the same day. He was aware of the Form 45 requirement from this past injury and as he had helped firefighters fill it out when he served as union president. Asked why he did not tell anyone about this injury as he had with his earlier injury, he said he did not know the extent of it and did not want to "make a mountain out of a molehill." In the moment, he was not sure if he needed medical treatment or if it would improve with time.

¶ 18    Witteman's doctor referred him to Dr. Anish Patel, an orthopedic surgeon. Dr. Patel gave him injections and prescribed physical therapy. When those did not alleviate his pain, Dr. Patel recommended spinal fusion surgery, which Witteman had on September 10, 2020. Witteman's pain persisted after surgery, and he sought a second opinion from Dr. Matthew Ross. According to Witteman, Dr. Ross said the first back surgery failed and recommended a second back surgery to "start from scratch." Witteman's second surgery took place on July 14, 2021. Witteman's condition improved with physical therapy but he continued to have pain, stiffness, and back

spasms. In May 2022, Dr. Ross opined that Witteman could not return to full-time work as a firefighter and gave him a permanent 30-pound lifting, pushing, and pulling restriction. Other than a few light-duty assignments, Witteman had not returned to full firefighter duties.

¶ 19                                Testimony of Fellow Firefighters

¶ 20        Witteman's fellow firefighters, Charles Romeo, Mark Pollard, Bradley Pacyga, and Matthew Dubik, completed witness reports two weeks after the incident and testified before the Board. Their testimony conflicted with Witteman's, with each other's and, at times, with their own witness statements.

¶ 21        Romeo testified that he and Pollard took a second ambulance to the patient's home. When they arrived, the patient was sitting in a recliner. He had a "Hoyer lift," a metal frame with a triangle bar that patients can use to lift themselves. The patient used the Hoyer lift to move his upper body onto the stretcher while Pollard, Pacyga, and Dubik assisted by moving his legs. Romeo did not help move the patient, and he did not see Witteman helping either. He could not recall who pushed the stretcher down the ramp and into the ambulance, but said Witteman may have helped. During the call, Romeo never saw Witteman wince, fidget, grimace, or otherwise indicate he was in pain, and Witteman never told him he was in pain. Romeo was assigned to a different fire station and so did not speak to Witteman after the call.

¶ 22        Mark Pollard arrived at the patient's house with Romeo. His witness report stated that he, Witteman, Pacyga, and Dubik "grabbed a different area of the patient and assisted moving/sliding patient onto the [stretcher]." Before the Board, however, he could not recall how the patient got onto the stretcher and had no memory of Witteman helping. But, he said, "[t]here would have been no reason why" he would not have helped because "[i]t's not like a huge guy is going to be there and someone just stands around and watches." Pollard also had no recollection of the patient

having a Hoyer lift. Witteman and Dubik wheeled the patient outside. Pollard offered to help lift the stretcher over a high curb but Witteman and Dubik declined. At no time did Pollard notice any indication from Witteman that he was injured.

¶ 23        Bradley Pacyga, Witteman's partner, testified that the patient used a Hoyer lift to move himself onto the stretcher because he did not want anyone to touch him. Once he got his upper body and hips onto the stretcher, Pacyga and Pollard, who were at the patient's feet, moved them over. Pacyga did not see Witteman lift the patient. He did not remember Witteman helping to push the stretcher down the ramp but said it was possible. He said he drove the ambulance to the hospital while Witteman attended to the patient in the back. When they got to the hospital, the patient moved himself onto the bed because he did not want to be touched.

¶ 24        Pacyga testified that Witteman never told him he hurt his back and made no non-verbal indications of pain. Nor did Witteman indicate for the rest of the shift that he had been injured or was in pain. Pacyga disagreed with the suggestion that he and Witteman were not getting along at the time but acknowledged they had a strained relationship in the past and did not speak to each other outside of work.

¶ 25                                Day Two of Hearings

¶ 26        The Board adjourned to subpoena additional witnesses. When it reconvened 11 months later, Witteman's attorney asked to amend Witteman's disability application to add that not only was he injured in transporting the patient from the chair to the stretcher, but "[a]lso, transporting patient down wheelchair ramp and transporting patient over curb and parkway into ambulance." The Board allowed the amendment.

¶ 27        Lieutenant Matthew Dubik testified that he took a fire truck to the call because he recognized the address and knew that the patient's weight and physical condition might require

additional assistance. He described the patient as average, weighing about 220 or 230 pounds. He denied that the patient weighed 400 pounds.

¶ 28 In his witness report, Dubik stated, "Pacyga, Pollard, and I helped place the patient's legs on the cot. The patient then slid himself onto the cot with assistance from Pollard and me. Pacyga, Pollard, Witteman, and I centered the patient on the cot and then raised the cot via the electric motor." During his testimony, however, he said the patient did not want to be touched and moved himself from the reclining chair to the stretcher. Witteman was near the patient's head, Pollard and Pacyga were near his feet, and Dubik was on the side. None of the firefighters lifted the patient. While he and Pollard took the patient down the ramp to the ambulance, Witteman carried the medical equipment bags. He acknowledged that Witteman may have assisted in moving the patient down the ramp, given the patient's weight.

¶ 29 Dubik never heard Witteman indicate injury or pain. Dubik went on two more calls with Witteman during the shift and could not recall Witteman having trouble performing his duties. He also had no recollection of Witteman stretching on the floor, having difficulty walking, being in pain, or unable to perform his firehouse chores that day. He learned that Witteman was injured three or four shifts later.

¶ 30 Chief James Adams could not recall how he learned of Witteman's injury. He also could not recall telling Witteman to seek medical help from his personal physician. He said he had no reason to doubt Witteman's testimony that he called Adams three hours after he completed his shift.

¶ 31 The Board selected three physicians—Dr. Richard Tuttle, Dr. Michael Peters, and Dr. David Schneider—to perform independent medical examinations and assess whether

Witteman's back injury was work-related. The physicians submitted reports and provided deposition testimony.

¶ 32        Dr. Tuttle examined Witteman and issued a report opining that Witteman was disabled from performing full, unrestricted firefighter duties. Dr. Tuttle noted that Witteman injured his back in 2015, but did not find that to be a pre-existing condition to his present injury. He stated that, in his opinion, with a reasonable degree of medical certainty, the lifting incident solely caused the back injury.

¶ 33        Dr. Peters also examined Witteman and similarly opined that he was disabled from performing full, unrestricted firefighter duties and that "[t]he April 14, 2020 lifting injury was the direct cause of aggravating his underlying degenerative lumbar spine disease." Dr. Peters noted that Witteman's explanation of how the patient was transferred differed from the written reports by the other firefighters present, but stated that the "transfer he described could still have caused an exacerbation" of his underlying degenerative lumbar spine disease.

¶ 34        Dr. Schneider examined Witteman and opined that he is "completely disabled from work-related activities after [the] injury which occurred on April 14, 2020." He noted that Witteman had "pre-existing arthritis in his back" but concluded he had not experienced a significant disability before the lifting incident.

¶ 35        Witteman was also examined multiple times by Dr. Anis Mekhail, the Village's workers' compensation physician. Dr. Mekhail diagnosed Witteman with a herniated disc that he said was causally related to a work injury.

¶ 36        After Witteman testified, the Board sent additional medical records to the independent medical experts and asked them to supplement their opinions based on this question: "If the Pension Board were to conclude (based upon eye-witness testimony) Firefighter Witteman did

not participate in lifting a patient on the, April 14, 2020, call in question, would it change your opinion regarding whether the Witteman's injury is duty related? If so, please explain further."

¶ 37    In his supplemental response, Dr. Tuttle noted that Witteman's medical records show that his description of the incident had been consistent. But, if the Board found that Witteman did not participate in lifting the patient, it would be his opinion to a reasonable degree of medical certainty that the injury was not duty-related. Dr. Peters similarly concluded that Witteman's injury would not be related to his firefighter duties if he did not participate in lifting the patient. Dr. Schneider declined to give an opinion based on a "hypothetical observation" as to whether Witteman could have injured his back if he had not lifted the patient. He stated that he could only rely on the information from the patient, which he acknowledged the patient self-reported.

¶ 38    The Board also admitted Witteman's mental health records, which included diagnoses of post-traumatic stress disorder, generalized anxiety disorder, and depression, for which he was briefly hospitalized and a description of the medications to treat them. Witteman testified to the Board about his mental health issues.

¶ 39                                  Board Decision

¶ 40    The Board voted 3 to 1 to deny a line-of-duty disability pension but unanimously awarded a non-duty pension. The Board issued a 66-page written decision and order, which found that Witteman failed to prove that lifting and transporting the patient was the cause of his disability.

¶ 41    The Board did not dispute that Witteman was disabled but found his testimony was not credible and that he had misrepresented how his injury occurred. The Board cited Witteman's failure to immediately report his injury to coworkers or complete a Form 45, despite having done so with his earlier back injury. Further, Witteman testified that after speaking with Chief

Adams, he was unsure what to do regarding his injury; yet, as union president, he assisted injured coworkers in completing Form 45 injury reports.

¶ 42    The Board also found that Witteman contradicted his testimony and written statements. He initially claimed he was injured when he lifted the patient from the chair to the stretcher. Then, after the first day of hearings, he amended his application to state he was also injured when he transported the patient down the wheelchair ramp, over the curb and parkway, and into the ambulance. The Board noted that "it was only after sitting through almost two days of testimony and learning the record evidence impeached his claims did he change his application." This amendment "directly contradicts his initial testimony, his Form 45 (which [Witteman] filled out) and his pension application, which [Witteman] signed under the pains and penalties of perjury." Consequently, the Board placed no weight on his testimony as to the cause of his injury.

¶ 43    Conversely, the Board found the testimony of the responding firefighters credible. The Board reviewed each witness's testimony and acknowledged that some of their testimony about who lifted the patient and who moved the stretcher down the ramp was conflicting. But none of the firefighters testified that Witteman moved the patient from the chair to the stretcher or recalled Witteman saying or otherwise indicating he was injured.

¶ 44    The Board described Witteman's demeanor and conduct during his testimony as "evasive and agitated." The Board said that Witteman's demeanor "combined with his shifting reasons for disability, impeachment, and evidence contradicting his competing version of events led the Board to find [Witteman] less than credible."

¶ 45    According to the Board, the medical evidence also did not support a finding that Witteman's disability resulted from performing an act of duty. The Board noted all three

doctors found him to be disabled. Drs. Tuttle and Peters, on whom the Board relied, concluded that if Witteman did not lift the patient, his disability was not work-related. The Board placed no weight on Dr. Schneider's opinion, noting that his conclusion was inconsistent with his agreeing that a patient's self-reporting may be inaccurate.

¶ 46　　The Board ordered that Witteman be given a non-duty pension benefit of $4,530.75 per month, with a retroactive payment of $8,823.59.

¶ 47　　　　　　　　　Administrative Review in Circuit Court

¶ 48　　Witteman sought administrative review. The circuit court affirmed the Board's decision, finding it was not against the manifest weight of the evidence.

¶ 49　　The court noted that while some witness testimony was conflicting, enough testimony supported the Board's findings that Witteman did not lift the patient from the chair to the stretcher or move the stretcher to the ambulance. The court also concluded that the Board did not err in finding Witteman was not credible based on his failure to notify the Department of his injury, his decision to amend his application, and his decorum during the hearings. Lastly, the court rejected Witteman's contention that the Board improperly weighed the testimony of the independent medical examiners, stating the Board and not the doctors "determine whether a covered act causes an applicant's disability." The court held that the facts supported the Board's decision that Witteman's injury did not occur in the line- of-duty.

¶ 50　　　　　　　　　　　　　　Analysis

¶ 51　　　　　　　　　　　　Standard of Review

¶ 52　　The Administrative Review Law governs appeals from administrative hearings. See 735 ILCS 5/3-101 to 3-113 (West 2022). We review the Board's decision, not the circuit court's. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006). The standard

of review varies depending on whether the question involves facts, law, or a mix of both. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008).

¶ 53       The findings and conclusions of an administrative agency on questions of fact are deemed *prima facie* true and will not be disturbed unless against the manifest weight of the evidence. *Trettenero v. Police Pension Fund of City of Aurora*, 33 Ill. App. 3d 792, 849 (2002). When deciding claims, the Board resolves conflicts presented by the evidence and determines the credibility of witnesses. *Peterson v. Bd of Trustees of the Des Plaines Firemen's Pension Fund*, 54 Ill. 2d 260, 263 (1973). Additionally, "because the weight of the evidence and the credibility of the witnesses are within the province of the [Board], there need only be some competent evidence in the record to support its findings." *Iwanksi v. Streamwood Police Pension Board*, 232 Ill. App. 3d 180, 184 (1992). That an opposite conclusion may be reasonable or that we might have ruled differently does not justify reversing administrative findings. *Kelly v. Retirement Board of the Policemen's Annuity & Benefit Fund of Chicago*, 2022 IL App (1st) 210483, ¶ 30. Whether a back injury is work-related constitutes a factual determination. Thus, we will affirm so long as the Board's decision is not against the manifest weight of the evidence.

¶ 54                                   Conflicting Witness Testimony

¶ 55       Witteman argues that the Board erred by failing to consider the credibility of the firefighter witnesses or address the inconsistencies in their testimonies. He identifies six areas of discrepancy: (i) the estimated weight of the patient, which ranged from 220 to 400 pounds, (ii) who brought the stretcher in from the ambulance, (iii) how the patient was moved from a chair to a stretcher, (iv) who moved the patient's stretcher from the house to the ambulance, (v) who carried the stretcher over the curb, and (vi) to whom Witteman reported his injury and when.

Witteman accuses the Board of selectively using testimony to support its decision and failing to resolve conflicts among the witnesses.

¶ 56    The Board has the authority to consider the credibility of witnesses. *Miller v. Board of Trustees of the Oak Lawn Police Pension Fund*, 2019 IL App (1st) 172967, ¶ 40. Witteman contends, however, that the Board must evaluate the testimony of every witness and "resolve any and all conflicts." He relies on *Smith v. Department of Professional Regulation*, 202 Ill. App. 3d 279, 284 (1990). As in other cases, the *Smith* court explained the trier of fact's role in an administrative hearing, "It is for the hearing officer, as the trier of fact, to evaluate all evidence, judge the credibility of witnesses, resolve any conflicts in the evidence, and draw reasonable inferences and conclusions from the facts." *Id*. The court in *Smith* did not hold that the trier of fact (here, the Board) must resolve every conflict of evidence. Nor did it require that a decision explain how conflicts in evidence and testimony were resolved. Indeed, Witteman does not cite any authority (and we found none) supporting his argument.

¶ 57    The record contains "some competent evidence" to support the Board's findings. Nothing more is required. *Iwanksi v. Streamwood Police Pension Board*, 232 Ill. App. 3d 180, 184 (1992). The Board found Witteman's testimony about the occurrence of his injury to be not credible, based on contradictions and his failure to report it immediately, despite having done so five years earlier. Initially, he claimed he had injured his back while lifting the patient out of the chair, but amended his application to include transporting the patient down the ramp, over the curb and parkway, and into the ambulance. Due to these inconsistencies, the Board placed no weight on Witteman's testimony regarding the cause of his injury.

¶ 58    The Board acknowledged that the other witnesses' testimonies were conflicting on who moved the patient from the chair to the stretcher and down the ramp, over the curb, and into

the ambulance. Nonetheless, the Board concluded that the witnesses consistently testified that Witteman took no part. This testimony sufficiently supports the Board's conclusion that an act of duty, that is, lifting the patient onto a stretcher and transporting him down a ramp and into an ambulance, was not the cause of Witteman's injury. Because this finding was not against the manifest weight of the evidence, we will not disturb it.

¶ 59                    Notification of Injury

¶ 60       Witteman contends the Board erred in finding he improperly reported his injury without evidence on proper injury reporting. Witteman states that he reported his injury well within the 45-day requirement. He references language in the Board's order observing that he did not report his injury immediately although it was significantly worse than his earlier back injury.

¶ 61       Witteman misconstrues the Board's finding. The Board acknowledged Witteman notified the Department within 45 days. Rather, the Board questioned the timing and manner in which he reported his injury. The Board noted that he did not report the injury immediately, as he had done in the past. This relates to credibility, which falls within the Board's province. *Miller*, 2019 IL App (1st) 172967, ¶ 40. The Board deemed it not credible that if Witteman were experiencing the worst pain in his life, he would not have said anything immediately, or that no coworker noticed he was injured or in pain. So, while the Form 45 report was timely, the Board found it not credible that he would noy have disclosed it in some way.

¶ 62                    Amendment to Application

¶ 63       Before the start of the hearing, the Board asked Witteman if he wanted to amend his application to seek a non-duty pension as an alternative. He agreed, and the Board amended the application without prejudice. Before the second day of hearings, Witteman asked to amend

his application to state that he also injured himself while transporting the patient down the ramp, over the curb and parkway, and into ambulance.

¶ 64     Witteman contends the Board erred by drawing an adverse inference from this amendment. Witteman cites section 2-616(a) of the Code of Civil Procedure (735 ILCS 5/2-616 (West 2022)), which allows a plaintiff to amend a complaint freely and suggests a pension application should be treated similarly. He further asserts the Board should not differentiate between an amendment it invites and one prompted by the applicant.

¶ 65     Again, Witteman misinterprets the Board's finding. The Board did not draw an adverse inference from his amendment regarding how the injury occurred. Instead, the Board questioned whether the amendment, coming after hearing testimony from witnesses who said he did not lift the patient, cast doubt on his credibility on the issue. As noted, the Board decides witness credibility (*Miller*, 2019 IL App (1st) 172967, ¶ 40) and may find the timing of the amendment raises doubt about his claim on how he injured his back.

¶ 66     Besides, the Board's inference had nothing to do with whether the Board invited the amendment or Witteman requested it. The initial amendment was a routine procedural request, addressing if he wanted the Board to consider an alternative remedy. Witteman's amendment impacted his credibility by involving how his purported injury occurred.

¶ 67                              Independent Medical Experts

¶ 68     Witteman contends the Board manipulated the medical expert testimony to deny him a duty disability pension. We disagree. The three medical experts found that Witteman was disabled. The Board agreed. The medical experts also initially agreed that Witteman's injury was work-related. But after hearing testimony disputing Witteman's version, the Board sought

supplemental opinions. Two opined that Witteman's back injury was duty-related only if he lifted the patient. The third provided a nonresponsive answer.

¶ 69       Although Witteman contends the Board "manipulated" the expert testimony, he cites no authority that prohibits the Board from asking medical experts hypothetical questions based on witness testimony. Based on all of the evidence, the Board can (and did) determine whether a covered act caused a disability. See *Jensen v. E. Dundee Fire Protection District Firefighters' Pension Fund Board of Trustees*, 362 Ill. App. 3d 197, 205 (2005).

¶ 70                                        Witteman's Demeanor

¶ 71       Witteman argues that the Board made an error in concluding that his "demeanor and conduct to be evasive and agitated." He claims that the Board failed to consider that his demeanor might have been caused by post-traumatic stress disorder, generalized anxiety disorder, depression, and medications. As noted, Witteman's mental health history was part of the record and considered in evaluating his demeanor. Regardless, the Board may consider Willeman's account of what caused his injury. See *Jensen*, 362 Ill. App. 3d at 205.

¶ 72       Witteman also argues that even if he appeared anxious or agitated, the Board should not have relied on that in assessing his credibility. He relies on *Roszak v. Kankakee Firefighters' Pension Board*, 376 Ill. App. 3d 130, 140 (2007), where a Board denied the firefighter a line-of-duty disability pension despite the unanimous medical opinions of three independent medical examiners stating that the firefighter was incapable of performing his duties. *Id*. at 143. The Board discounted the firefighter's testimony and the medical opinions because it felt the firefighter was evasive in responding to questions related to his job, living arrangements, earnings, and net worth. *Id*. at 141-43. The appellate court reversed the Board's decision, stating that the physical examinations supported the opinions and diagnoses, and the Board

should not have discredited the medical examiners' opinions based solely on the applicant's credibility in responding to tangential questions. *Id.* at 143-44.

¶ 73 Witteman similarly contends the Board should not have relied on what it described as his evasive demeanor in assessing his credibility. *Roszak* is distinguishable, however. There, the evasive responses were unrelated to the ultimate determination and did not affect the firefighter's truthfulness regarding his injuries. Unlike in *Roszak*, the testimony the Board found questionable was not tangential. For instance, Witteman acknowledged that in 2015, he immediately notified his coworker; yet, when he claimed to have a much more painful injury in 2020, he told no one until the next day, explaining that he is "not that kind of guy." In addition, after the first hearing day, he modified his explanation of how the injury occurred, which directly impacts on his credibility regarding the details of his injury.

¶ 74 The Board concluded that Witteman was disabled but, based on his demeanor and credibility, as well as the testimony of others, determined that he did not injure his back by lifting the patient and, thus, unrelated to his job. Again, the Board's finding was not against the manifest weight of the evidence.

¶ 75 Affirmed.