FIRST DIVISION

No. 1-09-0458

| | | |
|---|---|---|
| GARY A. DEVANEY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 07 CH 33943 |
| | ) | |
| THE BOARD OF TRUSTEES OF THE CALUMET CITY | ) | |
| POLICE PENSION FUND, and Individual Board Members | ) | |
| PATRICK J. O'MEARA, President; THOMAS | ) | |
| STIPANICH, Secretary; and JERRY JANIGA, GEORGE | ) | |
| BARICH, and LOUISE MUSYNSKI, Trustees, | ) | Honorable |
| | ) | Richard J. Billik, |
| Defendants-Appellants. | ) | Judge Presiding. |

JUSTICE LAMPKIN delivered the opinion of the court:

Plaintiff Gary Devaney filed a complaint for administrative review against the defendant Board of Trustees of the Calumet City Police Pension Fund (Board) and its individual members, who had determined that plaintiff was entitled to a nonduty, rather than a line-of-duty, disability pension based on findings that his disability did not result from or was not aggravated by a duty-related incident.

The circuit court reversed defendants' decision and granted plaintiff his requested relief. Defendants appealed, arguing that their decision was not against the manifest weight of the evidence and the circuit court improperly reweighed the evidence. For the reasons that follow, we affirm the judgment of the circuit court.

## I. BACKGROUND

Plaintiff had been employed as a police officer for the Calumet City police department since January 1989. Prior to his employment, he had back surgery in January 1985 for an injury that had caused left-sided back and leg pain. He was, however, medically cleared for police duty without any restrictions.

On March 11, 2001, plaintiff was off duty when he responded to an emergency call. Plaintiff engaged in a physical struggle with the suspect while trying to arrest him. During the struggle, plaintiff fell to the pavement on his back, and the suspect landed on top of plaintiff. That same day, plaintiff filed an employer's first report of injury or illness, stating that he was injured on the right side of his head, right leg and left hand. Plaintiff did not mention any injury to his lower back in that report and did not seek treatment immediately after the incident.

On March 26, 2001, when plaintiff was treated for allergies and sinusitis by his family doctor, Matt Chelich, D.O., plaintiff did not mention any back or leg pain. Plaintiff, however, returned to Dr. Chelich on May 1, 2001, complaining of lower back pain that radiated into his right leg. Plaintiff was prescribed pain killers and muscle relaxants and instructed to attend physical therapy. In August 2001, plaintiff was referred to Martin G. Luken, M.D., a neurosurgeon.

According to Dr. Luken's August 17, 2001 chart note, plaintiff reported that his surgery in 1985 for left-sided sciatica completely relieved his pain and he remained well until the March 2001 arrest incident. Ever since that incident, he experienced left buttock and hip pain with intermittent burning paresthesia extending distally over the anterior aspect of his right foreleg.

1-09-0458

Dr. Luken reviewed hard copies and the report of plaintiff's July 30, 2001 MRI scan and concurred with the interpretation of a right lateral disk protrusion at L4-L5 and right paracentral protrusion disk at L5-S1 with mass effect upon the associated nerve root. Dr. Luken concluded that plaintiff's current symptoms, neurologic deficit, and demonstrated disk herniation were the result of the March 2001 work injury. Dr. Luken scheduled a lumbar epidural steroid injection as a final attempt to manage plaintiff's problem nonoperatively.

At plaintiff's next visit on July 12, 2002, Dr. Luken noted that administrative problems had prevented plaintiff from undergoing the recommended steroid injection. Nevertheless, plaintiff had enjoyed gradual resolution of his pain and was able to continue working. He was, however, always aware of his right foot slapping, particularly when he was fatigued. Plaintiff continued to do reasonably well until he experienced a marked flare-up of symptoms two or three months prior to the visit. He could not recall a "specific injury that precipitated the worsening, though he suspects activities attendant to his care of a new puppy at home may have played a role in his increased symptoms." The pain and foot slapping markedly worsened and only slowly resolved during the intervening months, particularly for the two weeks when he was on vacation. Plaintiff described himself as very nearly pain free and the foot slapping was at its usual baseline. Dr. Luken reviewed plaintiff's June 14, 2002 MRI scan, and noted Dr. Grace Lee's comment suggesting that the demonstrated abnormality " 'does not look significantly worse than 7/31/01.' " Dr. Luken and plaintiff discussed the worrisome implications of plaintiff's foot weakness and the possibility of surgery. Dr. Luken scheduled the steroid injection.

3

Dr. Howard Robinson, who performed the steroid injection on July 30, 2002, noted that plaintiff, despite not getting the recommended injection in 2001, had reported improvement and was doing well until June 2002, when he sneezed and experienced a significant increase in his right lower-back pain into the right buttock. At an August 19, 2002 follow-up visit, Dr. Luken noted that plaintiff did not enjoy any significant symptomatic gains from the injection. Moreover, plaintiff stated that his level of activity had been significantly limited in recent months due to his lumbar symptoms. Dr. Luken recommended surgery, which was performed in January 2003.

Dr. Luken's remaining chart notes from February 11 through October 17, 2003, concerned plaintiff's follow-up visits and progress in treatment after surgery. Dr. Luken noted that plaintiff's pattern over the several months was to be typically comfortable at rest except for some vague right lower-back soreness, but walking or other substantial exertions precipitated right-sided lower-back spasms and pain, with painful radiation extending into his right leg or the toes of his right foot. They discussed spinal stabilization surgery, but plaintiff was not inclined to undergo further surgery and thought he could live with the pain for the time being. Dr. Luken stated that plaintiff had reached his maximum medical improvement from the surgery and any employment he pursued must be strictly sedentary.

Although plaintiff had worked since the March 2001 incident and up to the date of his January 2003 surgery, he was restricted to office work. After the surgery, plaintiff was not able to return to full duty or serve in any other capacity as a police officer. Plaintiff applied for a line-of-duty disability pension based on injuries he claimed to have sustained to his lower back as a result of the March 2001 incident.

In a March 2004 report, Dr. Julie Wehner stated that she examined plaintiff, who no longer complained of severe aching in his leg, but still had constant right, lower-back pain, and the dorsum of his ankle still hurt on an intermittent basis. The first two toes on his right foot were still asleep, and any prolonged walking made his right leg weak and start to slap. All of plaintiff's MRIs from 2001, 2002 and 2003 showed multilevel degeneration at L2-L3, L3-L4, L4-L5, and L5-S1. In addition, the preoperative MRIs were of somewhat poor quality, but did show disk protrusions at L4-L5 and L5-S1. Dr. Wehner concluded that plaintiff did suffer an injury on March 11, 2001. Although plaintiff had preexisting problems almost 20 years ago, he had surgical treatment for it and did not seem to have any significant treatment during the ensuing 20-year period. Dr. Wehner believed that plaintiff's previous back problems did not have a specific effect on the date of injury of March 11, 2001. The 2001 incident possibly worsened his back injury and resulted in him developing the herniated disks.

The Board selected three physicians to examine plaintiff: William Malik, M.D.; Thomas McGivney, M.D.; and Thomas Gleason, M.D.

In his report, Dr. Malik stated that he examined plaintiff in May 2006 and reviewed his medical history and records. Plaintiff reported that he had no back problems since his 1985 back surgery until the March 2001 incident. Thereafter, plaintiff developed right ankle and leg pain, sought treatment and eventually underwent a lumbar laminectomy in January 2003. Dr. Malik concluded that although plaintiff had underlying degenerative disk disease, the March 2001 incident caused a disk herniation when plaintiff fell to the ground, and plaintiff's injury was consistent with that cause.

In his May 2006 report, Dr. McGivney stated that he specialized in orthopaedic surgery and spinal surgery. He believed that plaintiff had a disability that prevented him from performing his full duties as a police officer. Dr. McGivney thought the cause of plaintiff's condition was most likely exacerbation of a preexisting condition. Dr. McGivney stated that plaintiff's January 1984 CT scan clearly showed a right-sided disk protrusion at L4-L5. Dr. McGivney also saw a bony bridge bar at L5-S1 with severe degenerative disk disease in plaintiff's 2001 and 2002 MRIs and 2003 postgadolinium scan. Dr. McGivney did not believe there was a significant change from plaintiff's 1984 CT scan to his July 2001 MRI. Dr. McGivney thought plaintiff had pretty severe degenerative disk disease at L5-S1 prior to his March 2001 injury. Dr. McGivney stated that it was difficult to determine how much disk material was actually present or causing some impingement of plaintiff's right hip pain, but there was some disk material to the right side at L4-L5 on the 1984 CT scan even though plaintiff stated that his symptoms were all left-sided at that time. Dr. McGivney speculated that there could have been a mismarking of the X ray.

In his May 2006 report, Dr. Gleason stated that his medical specialty was orthopaedics. He examined plaintiff, took his medical and work history, and reviewed his medical records. He concluded that plaintiff's disability prevented him from performing his full duties in the police department. Dr. Gleason noted plaintiff's account of his work history, which included the lower back and right leg pain he suffered after the March 2001 incident. Dr. Gleason stated that the likely cause of plaintiff's condition was probably a combination of factors, including genetically mediated processes, smoking, a past history including surgery in 1985, work history, everyday life activities, and recent activities like attending to the care of a new puppy at home.

At the hearing before the Board, plaintiff testified that his 1985 back surgery had fully resolved his symptoms of left-sided back and leg pain and he had served as a police officer without significant back problems or loss of time until the March 2001 incident. During that incident, the suspect lunged at plaintiff, who fell to the pavement and landed on his back. The suspect was on top of him, and they wrestled and rolled around in the middle of the street.

Plaintiff explained that his back did not hurt on the day of the incident, but a couple of days after the altercation he experienced increasing back pain that radiated into his right leg. However, he did not seek treatment for several weeks or mention the pain to Dr. Chelich during his March 26, 2001 appointment because the pain was not significant initially. Moreover, plaintiff was using pain relievers and thought the pain would subside. Plaintiff explained that he generally did not seek medical treatment unless there seemed to be a serious problem.

Plaintiff testified that after the March 2001 incident he could not run and never was assigned back to patrol duty. Although he was not officially placed on light duty, he stayed at the station and worked cases. He did not go on search warrants or arrests, and his police duties were primarily desk work.

Plaintiff testified that his pain worsened; it was a backache and his leg started to get numb. He returned to Dr. Chelich on May 1, 2001, and was prescribed various medications and therapy, but those measures failed to resolve his pain. After a series of epidural injections failed to alleviate his symptoms, he had surgery in January 2003, which significantly diminished the pain. His leg problems, however, persisted and he was unable to stand or sit for extended periods of time. The department told him that permanent light duty was not available, so he applied for the

disability pension after his doctor said there was nothing more he could do.

When questioned about Dr. Luken's reference to a flare-up in back pain related to puppy care, plaintiff explained that he tried to grab the dog when it was running around, experienced another sharp pain in his back, and his back hurt again. It was a recurring problem after the March 2001 incident; the injury was already there and he just aggravated it some more. Another instance occurred when he was standing at the sink and his young daughter came up behind him and surprised him. He experienced a sharp back pain when he quickly twisted and turned around.

Former Deputy Chief Patricia Sims-Smierciak testified that she worked at the police department with plaintiff but was not his superior officer at the time of the March 2001 incident. She corroborated plaintiff's testimony, stating that before the March 2001 incident, he was able to perform his full duties and did not complain of any back or leg pain. Shortly after the March 2001 incident, he would come into her office, sit down and complain that he was in a great deal of pain. She noticed that he had difficulty moving, sitting and standing, and appeared to be in a great deal of pain from March 2001 forward. The Board asked Sims-Smierciak to review police reports dated after March 2001 and questioned her about plaintiff's role in assisting in arrests. She responded that the reports listed plaintiff's name in the narrative and indicated only that he was present. She could not, however, discern from the reports the extent of any assistance he rendered. She testified that an officer could have been present even if he was not able to assist.

Dr. William Malik testified that he specialized in orthopaedic surgery, had examined plaintiff, and had reviewed his medical reports, records and films. Dr. Malik's review of those reports and records confirmed the accuracy of plaintiff's reported medical and work history.

Consistent with his May 2006 report, Dr. Malik stated that although plaintiff had preexisting degenerative changes in his lumbar spine and previous back surgery in 1985 that showed some left sciatica, he had recovered and done quite well after that surgery. After the March 2001 incident, plaintiff developed pain down his right leg, suggesting he had herniated disks on his right side, and right-sided sciatica. Despite adequate and conservative care, plaintiff's condition did not improve and he had lumbar laminectomy surgery.

Dr. Malik testified that plaintiff's 1985 hemilaminectomy was performed on the left side at the L4-L5 disk level and possibly at L5-S1. The disk herniations found in plaintiff's spine after the March 2001 incident were on his right side and corresponded to his complaints of pain and drop-foot problems with his right leg. The 2001 incident caused new trauma and new pathology at the same disk levels as the 1985 surgery, but now on the right side. Dr. Malik explained that it was not unusual for a disk herniation to get worse over time and plaintiff's drop-foot was consistent with a lumbar spine injury and a lumbar herniation progression from pain to a loss of function. Furthermore, there was no evidence in the record that plaintiff's degenerative disk disease was producing symptoms and causing him a problem before the 2001 incident.

Dr. Malik testified that it was not unusual for a patient with lumbar disk herniation to have his first pain symptom in his hip, leg or ankle. Dr. Malik explained that the herniation happens over a period of time; as the disk is extruded, then the patient may develop pain down the leg, and the initial symptoms may or may not include back pain. Plaintiff's back pain and right leg symptoms were explainable by the March 2001 incident and did not correspond with his prior left-sided symptoms from 1985.

Dr. Malik opined that plaintiff's 1985 surgery successfully resolved his left-sided sciatica, but that injury may have left him more susceptible to additional injury. Dr. Malik also opined that the March 2001 incident was a competent cause of plaintiff's new complaints of right-sided back pain and sciatic pain down his right leg.

When the hearing concluded, the Board denied plaintiff a line-of-duty disability pension and instead granted him a nonduty disability pension. The Board concluded that plaintiff suffered from a back disability, but it did not result from and was not aggravated by the performance of an act of duty. Plaintiff timely sought administrative review of the Board's decision.

After briefs and oral argument, the circuit court reversed the Board's decision and entered judgment in plaintiff's favor, granting the relief sought in his complaint for administrative review. The circuit court held the Board's finding that the March 2001 incident did not cause or aggravate plaintiff's disability was against the manifest weight of the evidence. The Board appealed.

## II. ANALYSIS

The Board does not dispute that the March 11, 2001 incident constituted an act of duty and plaintiff suffers from a lower back disability that precludes him from performing full service for the police department. Furthermore, the Board recognizes that a preexisting condition does not bar an applicant from receiving a line-of-duty disability pension. Rather, the Board determined that the March 11, 2001 incident did not cause or contribute to plaintiff's disability to his back. The Board argues that competent evidence supports its determination and the circuit court improperly reweighed the evidence and substituted its judgment for the Board's when the circuit court found the Board's decision was against the manifest weight of the evidence and

reversed the Board's denial of a line-of-duty disability pension to plaintiff.

Specifically, the Board argues the evidence supports its decision where plaintiff failed to initially complain of a back injury on March 11, 2001, and had sought treatment for his back on "numerous occasions" before the March 2001 incident. Furthermore, Dr. McGivney opined that there was no significant change in plaintiff's degenerative disk disease since his 1984 CT scan to his July 2001 MRI. According to the Board, police department records indicated that plaintiff was actively involved in securing warrants, and Deputy Sims-Smierciak could not give an exact date for when she first observed plaintiff's physical discomfort and difficulty in moving. In addition, the Board found that Dr. Luken's note concerning plaintiff's attribution of his back pain to caring for a new puppy constituted evidence of an intervening cause for plaintiff's disability.

An administrative agency's findings and conclusions on questions of fact are deemed to be *prima facie* true and correct. 735 ILCS 5/3-110 (West 2006). When examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or substitute its judgment for that of an administrative agency. City of Belvidere v. Illinois State Labor Relations Board, 181 Ill. 2d 191, 204 (1998). Instead, a reviewing court is limited to ascertaining whether an agency's findings of fact are against the manifest weight of the evidence. City of Belvidere, 181 Ill. 2d at 204. An agency's findings are against the manifest weight of the evidence where the opposite conclusion is clearly evident. City of Belvidere, 181 Ill. 2d at 204. "The mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings." Robbins v. Board of Trustees of the Carbondale Police Pension Fund, 177 Ill. 2d 533, 538 (1997). "If the record contains evidence

11

that supports the agency's decision, it should be upheld." Robbins, 177 Ill. 2d at 538.

The Board emphasizes that plaintiff did not report any lower-back injury or pain when he filed the initial injury report with his employer on the date of the incident and again when he saw his family physician about two weeks later on March 26, 2001. Furthermore, plaintiff did not seek medical treatment for a back injury until May 1, 2001, and he continued to work for the police department until January 2003.

We note, however, that plaintiff testified he did not initially feel pain in his lower back and that symptom developed after he filed his March 11, 2001 injury report, wherein he did report right leg pain. He explained that he waited to seek treatment because the initial pain was not significant, and he was taking some pain medication and thought the pain would subside. This was in keeping with his usual practice not to seek medical treatment unless a serious problem developed. Furthermore, Dr. Malik testified that plaintiff's initial symptom of leg pain and delayed onset of back pain were consistent with a disk herniation injury, which creates symptoms that get worse over time. Moreover, no medical evidence refuted Dr. Malik's testimony that as the disk is extruded, the patient may develop pain down his leg and the initial symptoms may or may not include back pain.

The Board also argues that plaintiff's medical records indicate he sought medical treatment for his back before the March 2001 incident on three occasions. According to the record, plaintiff telephoned Dr. Chelich on May 18, 1991, to report that he "over-exerted himself on the previous evening and had significant discomfort and tightness in the lumbar spine without radiation to the extremities *** ." Dr. Chelich prescribed some medicine, told plaintiff to

12

continue intermittent heat and rest, and come in if he did not improve in a few days.

Then, during an exam on May 27, 1993, Dr. Chelich noted that plaintiff complained of pain in his back to his ribs for the past two days and wheezing. He was doing heavy work and his back popped. He had no numbness, weakness, or loss of continence. He was not tender over his spine and his heel-toe walk was intact. For his back strain, Dr. Chelich gave plaintiff some sample medication and recommended rest and heat.

Finally, at a follow-up appointment for plaintiff's blood pressure on June 22, 1999, Dr. Chelich noted that plaintiff had "some back pain about a week ago, used some Motrin and it seems to have responded nicely."

Those three occasions occurred over a span of 16 years and do not negate the validity of the overwhelming medical evidence and witness testimony that plaintiff had no problems performing his police duties prior to the March 11, 2001 incident. The department knew about plaintiff's 1985 surgery and degenerative disk disease and cleared him for unrestricted police duty in 1989 following a medical examination. Morever, plaintiff and Deputy Sims-Smierciak testified that plaintiff performed his full duties prior to the March 2001 incident without any limitation due to any physical difficulties. Furthermore, the Board's determination that those three occasions of medical treatment constituted significant evidence is refuted by Dr. Malik's testimony that plaintiff had recovered and done quite well after his 1985 surgery. In addition, Dr. Wehner reviewed plaintiff's medical records and concluded that he had no significant treatment for his degenerative disk disease during the 18-year period between his 1985 and 2003 back surgeries.

The Board also placed great weight on Dr. McGivney's statement that plaintiff had severe degenerative disk disease prior to the March 2001 incident and there was no significant change from his 1984 CT scan, which showed a right-sided disk protrusion at the L4-L5 disk level, to his 2001 MRI. It is important, however, not to take Dr. McGivney's statement out of context. Like all the other doctors, Dr. McGivney thought that plaintiff's current condition was the result of an exacerbation of his preexisting condition. All the doctors noted that plaintiff had degenerative disk disease at the L4-L5 and L5-S1 levels prior to March 2001. Furthermore, although Dr. McGivney stated that plaintiff's 1984 CT scan showed some disk material to the right side at the L4-L5 disk level, he acknowledged that it was difficult to determine how much disk material was actually present or impinging to cause plaintiff any right-sided pain. In addition, Dr. McGivney relied on plaintiff's July 2001 MRI when he opined that there was no significant change in plaintiff's degenerative disk disease since his 1984 CT scan, but Dr. Wehner stated that plaintiff's preoperative MRIs were of somewhat poor quality.

The medical evidence in the record does not support a finding that plaintiff's back injury did not result from or was not aggravated by the March 2001 incident, and there was abundant medical evidence that the 2001 incident aggravated plaintiff's degenerative disk disease. As previously noted, Drs. Luken, Wehner, and Malik all found that plaintiff's 1985 surgery had resolved his prior left-sided back problems. They also found that plaintiff's current right-sided symptoms were caused by the March 2001 incident, which aggravated his preexisting degenerative disk disease and resulted in him developing the herniated disks. Dr. McGivney neither identifies the cause nor eliminates the March 2001 incident as the cause of plaintiff's

14

disability. Finally, Dr. McGivney's report fails to consider, as did the reports of the other examining physicians, that plaintiff was able to perform his work duties prior to March 2001 without any significant loss of time or restricted duty, and his right-sided symptoms arose after the March 2001 incident.

The Board claims that Dr. Malik apparently failed to review plaintiff's 1984 CT scan because he did not specifically identify any diagnostic tests from before March 2001 that he reviewed to support his finding that plaintiff experienced no right-sided symptoms in his lower back before March 2001. Our review of the record, however, reveals no evidence that Dr. Malik did not have all the pertinent records available for his review. He testified that he reviewed all of plaintiff's medical records, including the information concerning his previous back surgery. Furthermore, Dr. Malik clearly testified about the differences between plaintiff's prior spine problems and those that rendered him disabled after the March 2001 incident.

The Board argues plaintiff's testimony that he primarily stayed in the office and worked from a desk was contradicted by department reports dated October 4, 2001, and September 4, 2002, which indicated that he was present during arrest calls or actively involved in securing warrants. The record, however, refutes the Board's assertion and supports plaintiff's testimony that he performed light duty and primarily worked cases from a desk after his March 2001 injury. Specifically, a general case report indicated that on October 4, 2001, plaintiff and another officer went to the county jail to pick up a suspect detained on an outstanding warrant and then transported the suspect to the police department for bookings. Furthermore, July and August 2002 case reports concerning a homicide investigation indicated that other officers arrested the

suspect and transported him to the police department, where the case was turned over to plaintiff as the investigating detective. Plaintiff questioned the suspect and interviewed witnesses and the victim's father and son. Plaintiff also contacted the coroner's office to obtain a copy of its findings and consulted with the assistant State's Attorney regarding the investigative findings.

The Board also attempts to discount Deputy Sims-Smierciak's testimony, arguing that she could not give an exact date for when she first observed plaintiff in discomfort. The record, however, is clear that Deputy Sims-Smierciak remembered the 2001 incident despite the lapse of several years. She also remembered that shortly after that incident, plaintiff complained about his back and leg pain, and she saw that he was in a great deal of pain and had difficulty moving, sitting and standing.

The Board asserts that evidence of an intervening cause for plaintiff's disability is reflected in Dr. Luken's chart note that plaintiff attributed his lower back pain to his care of a new puppy. The Board notes that Dr. Gleason also listed the puppy care among the combination of factors that contributed to plaintiff's condition. The record, however, does not support the Board's assertion.

In July 2002, Dr. Luken noted that plaintiff reported a marked flare-up of symptoms in April or May of 2002 and thought that care of a new puppy in the home might have played a role in his increased symptoms. Dr. Luken, however, did not characterize that activity as a cause of plaintiff's injury or disability, and the Board ignores Dr. Luken's stated medical opinion that the March 2001 incident caused plaintiff's right-sided back pain and sciatica. Dr. Luken's opinion was especially noteworthy because, unlike the appointed evaluators, he had the benefit of

assessing plaintiff's condition through an extended course of treatment. Coyne v. Milan Police Pension Board, 347 Ill. App. 3d 713, 723 (2004).

Furthermore, the chronology of events refutes the Board's speculation that the April/May 2002 puppy care may have constituted an intervening cause. The medical evidence established that plaintiff sought treatment for right lower-back pain and right leg pain in May 2001. His disk herniation was documented as existing in July 2001, and Dr. Luken informed him that his injury would require surgery if conservative treatment failed. After plaintiff suffered the back injury in March 2001, he would experience recurring flare-ups of his pain symptoms from everyday activities like sneezing, chasing a dog or quickly twisting around.

The April/May 2002 activity was not an intervening cause; it did not break the chain of causation between the March 2001 incident and plaintiff's disability. The law is clear that a subsequent accident that aggravates the condition that was weakened by a work-related accident does not break the causal chain. Vogel v. Industrial Comm'n, 354 Ill. App. 3d 780, 786-88 (2005) (the claimant's three subsequent car accidents did not break the causal connection of the original work-related injury); Teska v. Industrial Comm'n, 266 Ill. App. 3d 740, 742-43 (1994) (the claimant's upsurge of neck pain experienced after bowling did not break the causal connection of the original work-related injury). Furthermore, the Board's speculation that the April/May 2002 activity constituted an intervening cause is refuted by the observations of Drs. Luken and Lee that plaintiff's disk disease did not look significantly worse from his July 2001 to his June 2002 MRI scan. Plaintiff's symptoms flare-up was consistent with Dr. Luken's post-surgery note that plaintiff was typically comfortable at rest except for some vague back pain, but

17

exertions would precipitate lower-back spasms and back and leg pain.

We have before us the same medical records and reports examined by the Board; only Dr. Malik testified, so factors such as the demeanor of the nontestifying doctors do not figure into an assessment of credibility. Even under the manifest weight standard applicable in this instance, the deference afforded the administrative agency's decision is not boundless. Wade v. City of North Chicago Police Pension Board, 226 Ill. 2d 485, 507 (2007). Having thoroughly examined the medical records, work records and hearing transcript, we hold, as did the circuit court, that the Board's decision was against the manifest weight of the evidence.

### III. CONCLUSION

For the reasons stated, we conclude that the Board's decision was against the manifest weight of the evidence and, therefore, affirm the judgment of the circuit court.

Affirmed.

HALL, P.J., and PATTI, J., concur.

1-09-0458

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

GARY A. DEVANEY,

Plaintiff-Appellee,

v.

THE BOARD OF TRUSTEES OF THE CALUMET CITY POLICE PENSION FUND,
and Individual Board Members  PATRICK J. O'MEARA, President; THOMAS
STIPANICH, Secretary; and JERRY JANIGA, GEORGE BARICH,
and LOUISE MUSYNSKI, Trustees,

Defendants-Appellants.

No. 1-09-0458

Appellate Court of Illinois
First District, FIRST DIVISION

January 25, 2010

Justice Bertina E. Lampkin authored the opinion of the court:

Presiding Justice Hall and Justice Patti concur.

Appeal from the Circuit Court of Cook County.
The Hon. Richard J. Billik, Judge Presiding.

**COUNSEL FOR APPELLANTS**
Atwell & Atwell Law Offices, Aurora, IL 60506
OF COUNSEL: Charles H. Atwell

**COUNSEL FOR APPELLEE**
Anthony G. Argeros, LLC, Chicago, IL 60603
OF COUNSEL: Anthony G. Argeros

1-09-0458

20