2019 IL App (1st) 172967

No. 1-17-2967

Third Division
May 1, 2019

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| DANIEL MILLER, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CH 16048 |
| | ) | |
| THE BOARD OF TRUSTEES OF THE OAK | ) | Honorable |
| LAWN POLICE PENSION FUND, | ) | Celia Gamrath, |
| | ) | Judge, presiding. |
| Defendant-Appellee. | ) | |

JUSTICE COBBS delivered the judgment of the court, with opinion.
Justices Howse and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    Following hearings, the Board of Trustees of the Oak Lawn Police Pension Fund (Board) issued an order awarding Daniel Miller a nonduty pension benefit and denying his request for line of duty disability pension benefit. Miller filed a complaint for administrative review in the circuit court of Cook County. The circuit court affirmed the Board's decision. On appeal, Miller argues that the Board erred in its decision denying the line of duty disability pension benefits. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3        The facts are derived from the pleadings and the record. Miller was a member of the Oak Lawn Police Department and held the rank of a patrolman. He was hired by the police department on May 1, 1996.

¶ 4                    A. Line of Duty Disability Pension Benefits Application

¶ 5        On April 28, 2014, Miller filed an application for a line of duty disability pension benefit, and in the alternative, a nonduty disability benefit. Miller alleged that he suffered "post traumatic stress disorder" (PTSD) as a result of multiple traumatic incidents covering an extended period of time. He alleged all of the incidents occurred while on duty as a police officer for the Village of Oak Lawn and these incidents further led to considerable personal issues.

¶ 6                            B. Events Preceding 2010

¶ 7        Beginning in 1987, Miller served in the United States Marine Corps. He was on active duty from 1987 to 1991 and then transitioned into the reserve component of the United States Marine Corps. Miller was hired by the Oak Lawn Police Department on May 1, 1996.

¶ 8        In 2004, he was called for active duty and was deployed to Iraq where he engaged in active combat. While in Iraq, Miller shot and killed a 12-year-old enemy soldier, who had pointed an assault rifle at him. After returning from Iraq, he completed a postdeployment survey and was cleared to return to police duty.

¶ 9        From 2005 to 2008, Miller participated in "intensive counseling" through the Hines Veterans Affairs Hospital (VA) at the recommendation of his reserve unit.

¶ 10        In 2007 Miller returned to Iraq. During his second tour in Iraq, he was injured while riding in an armored vehicle. His vehicle struck a hole, resulting in Miller being thrown into the air and landing on a piece of metal. He was transported to a trauma center and later

diagnosed with a broken tailbone. After his 2007 tour in Iraq, the Oak Lawn Police Department referred him for a mental evaluation. Subsequently, he was released to active duty as a police officer.

¶ 11    Following, his first tour in Iraq, Miller's wife, Julie, noticed that he had become obsessive-compulsive, lacked patience, and was temperamental. Following Miller's second tour, she observed that he had disturbed sleeping patterns and withdrew from the family.

¶ 12    C. Events of 2010

¶ 13    On April 27, 2010, the VA medical reports indicated that Miller was rated an 80% military service connected disability that included a 50% disability for PTSD.

¶ 14    1. August 10, 2010

¶ 15    On August 10, 2010, Miller responded to the Chicago Ridge Mall for reports of shots fired. Miller testified that he located and observed the offender commit suicide. Miller completed a police report regarding the incident, but the report did not indicate that he witnessed the suicide. Miller later admitted that he never told any other police officer he witnessed the suicide. Furthermore, the dispatch log documented that Miller did not arrive at Chicago Ridge Mall until after the shooting occurred.

¶ 16    2. August 12, 2010

¶ 17    On August 12, 2010, Miller responded to an "armed subject call." Miller stated he was the first officer on scene and observed a female shot in the chest and a male facedown on the ground. Miller claimed to have known the victim prior to her death and that he had spoken with her between 5 to 10 occasions. Miller stated that he did not touch the victim. However, the VA progress notes indicated that Miller responded to a murder/suicide incident in which

Miller "held his friend as she died." Miller did not participate in any therapy immediately after the incidents of August 10, 2010, and August 12, 2010.

¶ 18      Officer Cihocki testified that he was working on August 12, 2010, when the murder suicide occurred in Oak Lawn. He stated he was the first officer on the scene and that Miller responded after him. He observed that the victims were dead, and he recalled that the female was facedown in a slumped fetal position.

¶ 19                              3. October 13, 2010

¶ 20      On October 13, 2010, Miller went to the VA and sought treatment for alcohol consumption. His wife told him to seek treatment or she would file a divorce. He contacted and met his commander and another officer at the VA. While there, Miller yelled obscenities at the other officer. Miller ultimately accepted impatient treatment at the VA. He was placed on administrative leave pending an investigation for "conduct unbecoming" as a result of his behavior toward the other officer. Subsequently, two VA physicians cleared Miller for full police duty.

¶ 21                              D. Events After 2010

¶ 22      On January 26, 2011, Miller was served with notice of internal investigation regarding his October 2010 conduct at the VA. On May 2, 2011, Miller and the police department mutually agreed that Miller would serve a 30-day suspension after which he would return to duty in the patrol division.

¶ 23      On October 13, 2013, Miller responded to a call that a baby had been stabbed. Miller never exited his patrol car but escorted the ambulance to the hospital. Miller testified that he observed emergency room staff conduct life saving efforts on the infant. He stated he was handed the infant's bloody "onesie" as evidence. He placed it into a bag and tendered it to

detectives. Miller testified that he did not write any reports regarding the incident nor did he seal or initial the evidence bag. He further testified that he did not know if he was on the evidence log for this incident.

¶ 24 On February 26, 2014, officers responded to a house fire involving a murder/suicide. Miller was not on duty during the incident. However, he was later assigned to guard the scene. He did not enter the residence, but he observed the removal of bodies and those images brought back memories of incidents that he had seen during his military deployments. Miller did not accompany the bodies to the morgue and did not attend any autopsies. Neither did he seek any medical or psychological treatment after this incident.

¶ 25 On March 22, 2014, Miller was served with a divorce petition. On that same night, Miller was off duty and entered two taverns in Manhattan, Illinois, armed with a handgun. He consumed alcoholic beverages and at some point displayed his handgun. The police department's internal investigation revealed that Miller was approached by two uniformed Manhattan police officers, pulled out his handgun, and pointed the gun at both officers. The officers commanded him to put his gun down, but Miller did not listen to their commands. As a result, the officers admitted Miller to the hospital for alcohol intoxication. During his time at the hospital, Miller reported no psychological issues to medical staff.

¶ 26 On March 24, 2014, the Oak Lawn Police Department placed Miller on paid administrative leave as a result of the incident in Manhattan. On April 28, 2014, Miller filed for line of duty disability pension benefits. On November 13, 2014, Miller was arrested by the Manhattan Police Department and charged with two counts of misdemeanor aggravated assault and driving under the influence.

¶ 27 E. Pension Board Independent Medical Examinations

¶ 28 Pursuant to section 3-115 of the Illinois Pension Code (Code) (40 ILCS 5/3-115 (West 2016)), the Board had Miller examined by three licensed independent medical examiners, Dr. Steven Weine, Dr. Edward Tuder, and Dr. Catherine Frank.

¶ 29 Dr. Weine examined Miller on December 3, 2014, and certified him as disabled. Dr. Weine noted that "[t]he history and examination indicate that beginning in October 2010 Miller met criteria for Post Traumatic Stress Disorder." Dr. Weine further noted that "Officer Miller is presently disabled from Chronic PTSD following multiple traumatic exposures beginning with combat experiences in 2004." Dr. Weine opined that being exposed to multiple traumatic events that came both from duty and nonduty related activities caused Miller's chronic PTSD and ensuing disability. In addition to his report, Dr. Weine testified "this is not a case where I said I thought causality depended on one event. It depended on multiple events."

¶ 30 Dr. Tuder examined Miller on December 10, 2014, and certified him as disabled. Dr. Tuder opined that Miller's disabling conditions resulted from two specific identifiable acts of duty unique to police work. In addition to his report, Dr. Tuder testified that his opinion was premised upon Miller's truthfulness regarding the incidents in August 2010. He testified that he would likely change his opinion regarding causation if Miller was not truthful about the events of August 2010. Miller repeatedly informed Dr. Tuder that there were no significant psychological consequences from his military service. However, Miller never disclosed that he sought and received PTSD disability from the VA. Dr. Tuder did not recall Miller informing him about his involvement in an off-duty incident involving alcohol after his wife served him divorce documents. Further, he did not recall Miller informing him that he was on administrative leave with pay pending criminal charges. Dr. Tuder testified that it is

important to be aware of disciplinary history and potential suspensions in assessing whether there was a causal relationship between an applicant's PTSD and a specific unique identifiable act of police duty. Additionally, he noted that an applicant's credibility is an important factor in allowing a doctor to make a determination on causation of his disability.

¶ 31        Dr. Frank examined Miller on December 17, 2014, and certified him as disabled. In her report Dr. Frank noted that "Ofc. Miller dates the onset of his illness to 2010, but his PTSD and depression predate this time period and are well documented in the records reviewed." Dr. Frank further noted "[i]n addition, Ofc. Miller, although he attributes his symptoms to the traumas in 2010, continued to have periods of good to outstanding performance as a police officer following his psychiatric hospitalization in 2010 and his return to work." Dr. Frank opined that "[w]ith a reasonable degree of medical certainty, it appears as though there was not a specific act which caused Ofc. Miller's current impairment, but a cumulative number of acts in which death, injury, trauma, and a sense of helplessness were present; in both the military and in the police department." Dr. Frank further noted that Miller's current disability "[h]ad its origin in combat in the Marines with further exposure to traumas as a police officer which caused reoccurrence and exacerbation of symptoms."

¶ 32        In addition to her report, Dr. Frank testified that the events of 2010 did not directly relate to Miller's current request for disability. Dr. Frank testified that certain stressors could serve as stimulus and aggravate a preexisting PTSD condition. Dr. Frank opined that Miller had been able to discharge his duties until he was served with divorce documents and arrested.

¶ 33                    F. Pension Board Hearing and Decision

¶ 34        Following the hearings, the Board granted Miller a nonduty pension benefit. However, the Board unanimously denied Miller's request for line of duty disability pension benefits. In

reaching its decision, the Board found Miller's disability, PTSD, did not result from any specific identifiable act of "Police Duty." Additionally, the Board found that Miller engaged in a pattern of misrepresentation and exaggeration as to the alleged "cause" of his disability. As a result, the Board placed no weight on Dr. Tuder's conclusions because Miller concealed vital information that was necessary for Dr. Tuder to render an accurate opinion as to the cause of Miller's disability. Accordingly, the Board found Miller's testimony less than credible.

¶ 35                              G. The Circuit Court's Decision

¶ 36         Miller sought administrative review in the circuit court of Cook County. After considering the briefs and arguments of the parties, the circuit court affirmed the Board's decision. This appeal followed.

¶ 37                                   II. ANALYSIS

¶ 38         On appeal, Miller contends (1) that the Board erred in denying his request for line of duty pension benefits and (2) finding that his testimony was not credible. We first address Miller's latter contention that the Board erred in finding his testimony lacked credibility.

¶ 39                                A. Credibility Findings

¶ 40         The findings and conclusions of an administrative agency on questions of fact are deemed *prima facie* true and will not be disturbed unless they are against the manifest weight of the evidence. *Trettenero v. Police Pension Fund*, 333 Ill. App. 3d 792, 849 (2002). When deciding claims, it is within the province of the pension fund board of trustees to resolve any conflicts presented by the evidence and to determine the credibility of witnesses. *Peterson v. Board of Trustees of the Firemen's Pension Fund*, 54 Ill. 2d 260, 263 (1973). Additionally, "because the weight of the evidence and the credibility of the witnesses are within the

province of the [agency], there need only be some competent evidence in the record to support its findings." *Iwanksi v. Streamwood Police Pension Board*, 232 Ill. App. 3d 180, 184 (1992).

¶ 41 Here, the Board properly determined that Miller's testimony lacked credibility. Miller testified that he did not receive treatment for PTSD prior to responding to a murder/suicide in August 2010. However, the record contradicts Miller's testimony. The record reveals that Miller engaged in "intensive counseling" prior to his disabling acts. Notably, as early as April 27, 2010, Miller had been diagnosed and granted military related disability for PTSD. Miller's contradictions continued. He testified that he observed an individual commit suicide; however, he authored an official police report and made no mention of this observation. In addition, Miller's testimony is contradicted by dispatch log information and other police officer testimony. We find there is competent evidence in the record to support the Board's finding that Miller was not credible. Thus, we will not disturb the board's findings.

¶ 42 Miller relies on *Lambert v. Downers Grove Fire Department Pension Board*, 2013 IL App (2d) 110824, and *Roszak v. Kankakee Firefighters' Pension Board*, 376 Ill. App. 3d 130 (2007), to support his contention that the Board erred in finding him not credible. We find Miller's reliance unavailing.

¶ 43 In *Lambert*, a firefighter applied for line of duty disability pension following an injury to his right knee during a training exercise. 2013 Ill App (2d) 110824, ¶ 3. Despite the findings of various independent medical examiners that he was unable to perform the duties of the job, the pension board denied his application. *Id.* ¶ 20. Having observed his physical condition and demeanor during his hearing, the pension board found that the firefighter was not a credible witness. *Id.* The board further found the statements that the firefighter made to

his physician and medical examiners regarding the pain he experienced were not credible because he was able, *inter alia*, to sit without pain, control his pain with medication, and video surveillance of the firefighter showed him walking up steps in his yard and carrying household objects around his home. *Id.* In reversing the board's decision on appeal, the court determined that the firefighter's testimony and the board's observations were not inconsistent because the firefighter never testified that he could not sit, walk up steps, or carry household items. The court noted that the firefighter could not carry heavy objects like those he would be required to carry in the performance of his duties as a firefighter. *Id.* ¶ 36.

¶ 44     In *Lambert*, there was no inconsistency between the testimony of the firefighter and the evidence in the record. Here, however, Miller's testimony was inconsistent with the evidence in the record. Miller's testimony consistently contradicted his own police reports and other police officer testimony. Therefore, *Lambert* is inapposite.

¶ 45     In *Roszak*, the applicant firefighter was denied a line of duty disability pension by the board, despite the unanimous medical opinions of three independent medical examiners selected by the board finding that the firefighter was incapable of performing his duties. 376 Ill. App. 3d at 143. The board discredited the firefighter's testimony as well as the medical opinions because the firefighter was evasive in responding to questions related to his job, his living arrangements, his earnings, and his net worth. *Id.* at 141-43.

¶ 46     The appellate court reversed the board's decision. In doing so, the court reasoned that the opinions and diagnosis of the three independent medical examiners had been supported by physical examinations. *Id.* at 143-44. Therefore, it was improper for the board to use its determination that the plaintiff was not credible in responding to tangential questions to discredit the opinions of the medical examiners. *Id.*

¶ 47    *Roszak* is distinguishable from the present case. In *Roszak*, the firefighter was evasive in responding to questions related to his job, his living arrangements, his earnings, and his net worth. Those questions were unrelated to the ultimate determination and did not impact the plaintiff's veracity concerning his injuries. Unlike *Roszak*, Miller's questionable testimony at the hearings was not tangential to his mental disability. Rather his testimony directly contradicted information in the record that impacted the ultimate conclusion of the Board's findings. As such, Miller's testimony concerning his injuries lacked credibility.

¶ 48                    B. Proper Legal Standard for Line of Duty Disability Pension Benefits

¶ 49    The parties disagree on the standard of review applicable to the Board's decision denying Miller's line of duty disability pension benefits. The provisions of the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2016)) govern judicial review of final administrative decisions of the Board. 40 ILCS 5/4-139 (West 2016).

¶ 50    In administrative proceedings, we review the decision of the administrative agency, not the judgment of the circuit court. *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504 (2007). When an administrative agency's factual findings are contested, the court will only ascertain whether such findings of fact are against the manifest weight of the evidence. *Cook County Republican Party v. Illinois State Board of Elections*, 232 Ill. 2d 231, 243 (2009). "An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). Conversely, if the dispute is over an agency's conclusion on a point of law, the decision of the agency is subject to *de novo* review by the courts. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210-11 (2008). We review a mixed question of law and fact under a

clearly erroneous standard. *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 273 (2009). An administrative decision will be set aside as clearly erroneous only when the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Id.* Under any standard of review, a plaintiff in an administrative proceeding bears the burden of proof, and relief will be denied if the plaintiff fails to meet that burden. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d. 497, 532-33 (2006).

¶ 51        Miller advocates for a clearly erroneous standard, arguing that the issue decided by the Board involved a mixed question of law and fact. On the other hand, the Board contends that the manifest weight of the evidence standard is the proper standard because the Board's decision involved only a question of fact.

¶ 52        Here, the relevant question is whether an act of duty caused or contributed to Miller's mental disability, which has been routinely found to be a question of fact subject to the manifest weight of the evidence standard of review. *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504-05 (2007); *Marconi*, 225 Ill. 2d at 534; *Carrillo v. Park Ridge Firefighters' Pension Fund*, 2014 IL App (1st) 130656, ¶ 22; *Scepurek v. Board of Trustees of the Northbrook Firefighters' Pension Fund*, 2014 IL App (1st) 131066, ¶ 24; *Rose v. Board of Trustees of the Mount Prospect Police Pension Fund*, 2011 IL App (1st) 102157, ¶ 94; *Covello v. Village of Schaumburg Firefighters' Pension Fund*, 2018 IL App (1st) 172350, ¶ 42; *Village of Oak Park v. Village of Oak Park Firefighters Pension Board*, 362 Ill. App. 3d 357 (2005). In our review, we treat the findings and conclusions of the administrative agency as *prima facie* correct. *Kappel v. Police Board*, 220 Ill. App. 3d 580, 588 (1991). We do not reweigh the evidence or substitute our judgment for that of the agency. *Marconi*, 225 Ill. 2d at 532. "When sufficient evidence in the record supports an

administrative agency's findings, the decision will not be reversed." *Collura v. Board of Police Commissioners*, 135 Ill. App. 3d 827, 839 (1985).

¶ 53                              C. Line of Duty Disability Pension Benefits

¶ 54        Miller contends that the Board erred in denying him line of duty disability pension benefits. Under section 3-114.1 of the Code (40 ILCS 5/3-114.1(a) (West 2016)), a police officer qualifies for a line of duty pension equal to 65% of the salary attached to the officer's rank on the police force at the date of suspension of duty or retirement if "as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty, [the officer] is found to be physically or mentally disabled for service in the police department."

¶ 55        The Code defines an "act of duty" as follows:

> "Any act of police duty inherently involving special risk, not ordinarily assumed by a citizen in the ordinary walks of life, imposed on a policeman by the statutes of this State or by the ordinances or police regulations of the city in which this Article is in effect or by a special assignment; or any act of heroism performed in the city having for its direct purpose the saving of the life or property of a person other than the policeman." 40 ILCS 5/5-113 (West 2016).

¶ 56        Miller argues that the Code does not preclude line of duty benefits for aggravation of a mental disability. Citing *Alm v. Lincolnshire Police Pension Board*, 352 Ill. App. 3d 595 (2004) and *Devaney v. Board of Trustees of the Calumet City Police Pension Fund*, 398 Ill. App. 3d 1 (2010), he posits that line of duty disability pension benefits are available for aggravation of a preexisting condition, in this case, his PTSD. We disagree.

¶ 57  We first address Miller's reliance on *Alm* and *Devaney*. In *Alm*, the plaintiff, a member of his police department's bicycle patrol unit, suffered a sudden tear in the medial meniscus of his right knee while pedaling his bicycle. 352 Ill. App. 3d at 596. The injury required surgery, and as a result, he was restricted from performing in various physical activities that affected his ability to perform his job. *Id.* at 596-97. He applied for and was denied line of duty disability benefits. *Id.* at 596. The appellate court reversed, finding that the plaintiff was performing duties involving special risk because it had no clear counterpart in civilian life. *Id.* at 602-03. The court described that the plaintiff may have suffered from a cumulative stress injury in relation to his knee during the course of his patrol work. *Id.* at 601.

¶ 58  The court focused specifically on preexisting conditions related to physical injuries stating, "section 3-114.1 does not bar the award of a line-of-duty disability pension based upon the aggravation of a preexisting physical condition." (Internal quotation marks omitted.) *Id.* at 598 (quoting *Olson v. City of Wheaton Police Pension Board*, 153 Ill. App. 3d 595, 598 (1987)). However, the court noted that "a line-of-duty benefit is not available if the disabling condition is job-related stress associated with the general nature of police work or with circumstances such as interpersonal conflicts and concern about job performance, which are common in civilian workplaces." *Id.* at 600.

¶ 59  Miller misperceives the import of the term "aggravating preexisting condition" utilized by this court in *Alm*. We understand *Alm* only to mean that when reviewing a police officer's application for line of duty pension benefits the pension board and courts can look at the aggravating preexisting physical condition in relation to the officer's physical injuries. See *id.* at 598. Thus, *Alm* is inapplicable.

¶ 60    Miller's reliance on *Devaney* is similarly misplaced. In *Devaney*, the plaintiff had suffered from a preexisting degenerative disk disease prior to becoming a police officer. 398 Ill. App. 3d at 2. Later, while on the police force, plaintiff engaged in a physical altercation with a suspect, which resulted in an injury to his back. *Id.* He was placed on work restrictions, and after surgery he was no longer able to return to full duty or serve in any other capacity as a police officer. *Id.* at 4. Devaney specifically deals with a physical injury, which is distinguishable from Miller's mental stress. As noted above, the theory of "aggravating preexisting physical conditions" is inapplicable in matters that concern mental disability. Thus, *Devaney* is inapposite.

¶ 61    Miller next contends that he is "unaware of any legal authority supporting a conclusion that an applicant must pinpoint one specific act as being the cause of the mental disability." Our research reveals several cases that have noted that an officer seeking a line of duty pension must present medical evidence showing a specific identifiable act of employment caused his disability.

¶ 62    For example, in *Robbins v. Board of Trustees of the Carbondale Police Pension Fund*, the plaintiff claimed that his mental disability resulted from witnessing a suicide by shotgun during patrol duty and not generalized stress. *Robbins v. Board of Trustees of the Carbondale Police Pension Fund*, 177 Ill. 2d 533, 536-37 (1997). He contended that the reports of the pension board's psychologist and his three retained psychologists indicated conclusively that his disability resulted specifically from witnessing the suicide. *Id.* at 544. The pension board denied the plaintiff's line of duty pension benefits request, and our supreme court affirmed the decision. *Id.* at 537, 545. In affirming, the court specifically noted that in examining duty related stress cases "courts have required that plaintiff-police officers demonstrate their

disabilities are the result of a specific, identifiable act of duty unique to police work." (Internal quotation marks omitted.) *Id.* at 542. The court determined that the doctors who treated and examined the plaintiff agreed that his stress was related to his police work; however, the stress was not connected to any specific act that the plaintiff performed as a police officer. *Id.* at 544. In fact, one of the psychologist opined that the plaintiff's "continuous exposure to possible violence, as well as the pace of his duties in general, were of considerable stress." (Emphasis and internal quotation marks omitted.) *Id.*

¶ 63    Further, in *Ryndak v. River Grove Police Pension Board*, the plaintiff testified that in his 22 years as a police officer, he had been "shot at, beaten, seen people die in automobile accidents[,] and had a fellow officer die right in front of him." *Ryndak v. River Grove Police Pension Board*, 248 Ill. App. 3d. 486, 487 (1993). He recalled a specific instance in 1990 where he was beaten by an individual, which ultimately required him to have reconstructive surgery. *Id.* His personal physician observed that the plaintiff "suffered multiple stresses while employed in the police department," and that his mental disability was the "result of the circumstances of his police occupation." *Id.* at 488. Four psychiatrists also examined plaintiff. The pension board denied the plaintiff a line of duty pension.

¶ 64    In upholding the pension board's decision, the appellate court noted that although the physician found that plaintiff's mental disability "was caused by specific acts of his police service, the only psychiatrist to discuss a causal connection between plaintiff's employment and his psychological disability *** specifically stated that plaintiff's disability was not caused by an act of police service." *Id.* at 490. Furthermore, plaintiff's stress and depression were the result of "the violent nature of police duties" and were "problems related to the general nature of being a police officer, and not to a specific act of police service." *Id.*; see

also *Coyne v. Milan Police Pension Board*, 347 Ill. App. 3d 713, 725 (2004) ("[T]he record is replete with evidence that [the plaintiff's] psychological disorder resulted from the cumulative effect of traumatic duties he performed over his career as a police officer.").

¶ 65        Here, although Miller's PTSD diagnosis may be related in part to his police work, it does not necessarily follow that his disabling stress was triggered or resulted from the performance of a specific and identifiable act of police duty inherently involving special risk and not ordinarily assumed by a citizen in the ordinary walks of life. See 40 ILCS 5/5-113 (West 2016). The record demonstrates that Miller's police work generally contributed to his stress along with other external factors, for example his military experience and difficulties in his marriage. Even disregarding the external factors, Miller witnessing multiple violent incidences as a police officer alone would not satisfy the "act of duty" requirement for a duty related mental disability claim.

¶ 66        Furthermore, the record indicates that the medical examiners determined that Miller's disability was a result of cumulative events, rather than a specific act of duty. Dr. Frank found that Miller's PTSD and depression predate 2010 and are well documented in Miller's medical records. Dr. Frank opined that "with a reasonable degree of medical certainty, it appears as though there was not a specific act which caused [Miller's] current impairment, but a cumulative number of acts in which death, injury trauma, and a sense of helplessness were present; both the military and in the police department." Dr. Weine's medical conclusions were consistent with Dr. Frank's findings. Dr. Weine concluded that Miller's disability was not the result of a specific act of duty but, rather, "multiple traumatic event that came both from non-duty and from duty related activities."

¶ 67    We note that Dr. Tuder's conclusion was contrary to Dr. Frank's and Dr. Weine's conclusions. However, Miller concealed vital information from Dr. Tuder causing him to render an inaccurate opinion as to the causation of Miller's disability. Therefore, the Board placed no weight on Dr. Tuder's conclusion.

¶ 68    Notwithstanding Dr. Tuder's conclusion, the conclusions of the other medical examiners were that Miller's disability was a result of cumulative events, and conclusion to the contrary was not clearly evident. *Carrillo*, 2014 IL App (1st) 130656, ¶ 21. We find that the Board's decision was not against the manifest weight of the evidence.

¶ 69                              III. CONCLUSION

¶ 70    For the reasons stated, we affirm the judgment of the circuit court of Cook County, which affirmed the Board's decision.

¶ 71    Affirmed.