**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190779

Order filed February 17, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| CHRISTOPHER STAFORD, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellee, | ) | Will County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | Appeal No. 3-19-0779 |
| THE BOARD OF TRUSTEES OF THE | ) | Circuit No. 18-MR-3108 |
| CREST HILL POLICE PENSION FUND and | ) | |
| CITY OF CREST HILL, | ) | |
| | ) | |
| Defendants (The Board of Trustees of | ) | The Honorable |
| the Crest Hill Police Pension Fund, | ) | John C. Anderson, |
| Defendant-Appellant). | ) | Judge, Presiding. |

JUSTICE LYTTON delivered the judgment of the court.
Presiding Justice McDade and Justice Holdridge concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Trial court properly found board of trustees of police pension fund's denial of line-of-duty disability pension to police officer was against the manifest weight of the evidence where all medical professionals who treated and examined officer found he suffered from posttraumatic stress disorder (PTSD) caused by an on-the-job shooting incident.

¶ 2   Christopher Staford, a Crest Hill police officer, filed an application for a line-of-duty disability pension with the Crest Hill Police Pension Fund. Following a hearing, the Board of

Trustees of the Crest Hill Police Pension Fund (Board) found Staford disabled but denied him a line-of-duty disability pension. Staford appealed to the circuit court. The circuit court reversed the Board's decision denying Staford a line-of-duty disability pension. The Board appealed. We affirm the circuit court's decision.

¶ 3                                BACKGROUND

¶ 4        Christopher Staford was hired as a police officer for the Crest Hill Police Department in 2005. He was working as a patrol officer on December 11, 2010, when he and a suspect exchanged gunfire. According to Staford, the suspect fired two shots at him. During the incident, Staford's gun jammed. Shortly after the incident, Staford went to the emergency room, where he complained of feeling "rattled" and "very anxious." He was diagnosed with anxiety. After continuing to experience symptoms, Staford began seeing Dr. Puls, a clinical psychologist, who diagnosed him with PTSD. Staford took three leaves of absence from the Crest Hill Police Department as a result of his PTSD symptoms in January 2011, November 2011, and November 2012.

¶ 5        In April 2014, Staford was placed on administrative leave while the department conducted an internal investigation of his use of prescription narcotics. The department sent Staford to Dr. Samo to evaluate his fitness for duty. Upon accessing prescription records, Dr. Samo found that Staford obtained hydrocodone from multiple providers in large quantities. Staford told Dr. Samo that he had anxiety, difficulty sleeping, nightmares and irritability ever since the shooting incident of December 11, 2010. Staford stated that his condition improved allowing him to return to work, but he had several recurrences. He told Dr. Samo that the nightmares had worsened in the prior eight months. Dr. Samo diagnosed Staford with substance dependence and PTSD.

¶ 6        Following the department's internal investigation, Staford voluntarily resigned from his position with the police department. He filed an application for a line-of-duty disability pension

2

with the Crest Hill Police Pension Fund and later amended his application to alternatively seek a non-duty disability pension. The Board required Staford to be examined by three physicians: Dr. Robert Reff, Dr. Edward Tuder, and Dr. Cathrine Frank. Each submitted reports and supplemental reports. Initially, all three doctors found that Staford suffered from PTSD and is disabled as a result of the December 11, 2010 incident. The Board then asked the physicians for supplemental opinions based on additional records, including records showing Staford was hospitalized for several days in June 2016. The physicians treating Staford during his 2016 hospitalization diagnosed him with PTSD and major depressive disorder.

¶ 7       Dr. Tuder provided two supplemental reports. In his first supplemental report, Dr. Tuder opined that Staford's "erratic behavior" in 2013 to 2014 was caused by his abuse of pain medication, not PTSD. In his second supplemental report, Dr Tuder stated that Staford's disability was PTSD, which was the direct result of the December 11, 2010 incident. He found Staford did not suffer from any pre-existing conditions and that Staford's disability "was caused by the on-duty activity, not from the aggravation of a preexisting condition."

¶ 8       In his supplemental report, Dr. Reff concluded that Staford is disabled because he is "unable to perform full and unrestricted police duties." He found that Staford's inability "to perform full and unrestricted police duties" "has more to do with his inability to follow the codes of conduct that are required of him *** than to a psychiatric condition that developed due to a specific event while he was working for the City of Crest Hill." Dr. Reff admitted that Staford "appears to suffer from elements of Chronic Posttraumatic Stress Disorder" but found that despite that condition, Staford "was able to successfully function full duty for extended periods of time from the date of the shooting until he ultimately stopped working." When responding to a question about the likely duration of Staford's disability, Dr. Reff stated that Staford's "prognosis for

3

sustained remission of symptoms is guarded to poor." Dr. Reff opined that Staford's use of narcotic medication was not due to PTSD. Dr. Reff also believed that the "precipitant" to Staford's June 2016 hospitalization was not the December 11, 2010 incident but was Staford's estranged wife becoming pregnant and moving in with the father of her child.

¶ 9　　　　In her supplemental report, Dr. Frank maintained that Staford suffers from PTSD, as well as major depressive disorder. She found no evidence that Staford abused drugs prior to December 11, 2010, and believed the shooting incident was the direct cause of Staford's disability. She believed that Staford's drug abuse was consistent with someone suffering from PTSD and found no evidence that Staford abused drugs prior to December 11, 2010. She also found no evidence of any preexisting conditions. Dr. Frank concluded that Staford was "never able to return to his premorbid functioning" following the December 11, 2010 incident.

¶ 10　　　　Dr. Ronald Ganellen, who was retained by Crest Hill's workers compensation carrier, submitted two reports to the Board. Dr. Ganellen noted that Staford "functioned effectively as a police officer prior to the 12/11/10 incident." Following the incident, Ganellen believed that Staford was appropriately diagnosed with and treated for PTSD. Ganellen thought it was possible that Staford's symptoms could have been related to excessive use of narcotic medication and did not believe that Staford was completely "forthcoming and truthful" with his medical providers about his prescription drug use.

¶ 11　　　　A hearing on Staford's disability application was held before the Board in March 2018. Dr. Puls testified that he first saw Staford on January 21, 2011. He diagnosed Staford with PTSD. Dr. Puls concluded that Staford's PTSD was caused by the December 11, 2010 incident. Staford discussed his prescription drug use with Puls during his first visit and at subsequent visits. Dr. Puls believed that Staford's disciplinary issues and drug use were "exacerbated or driven by his PTSD."

4

Dr. Puls admitted that he performed no standardized tests on Staford because he did not believe they were necessary. He found Staford to be "a reliable informant" based on his more than 40 years' experience as a psychologist. Dr. Puls met with Staford for 45-minute sessions on 60 different occasions.

¶ 12    Dr. Puls provided a written summary of his treatment of Staford, showing that he treated Staford during four specific time periods: January 2011, November 2011, April 2012, and June 2014. Dr. Puls concluded that Staford had "lost his ability to fully function as a police officer" because of PTSD caused by the December 11, 2010 incident. Dr. Puls noted that "prior to the shooting incident he had never reported the symptoms that have dominated his life since then."

¶ 13    Dr. Farah Turks, Staford's primary care physician, provided her records to the Board. According to those records, on January 21, 2011, Staford complained of insomnia and nightmares for several weeks following a "shooting." He was diagnosed with acute stress disorder and prescribed Restoril and Zoloft. In April 2011, Staford began weaning off Zoloft. After being off Zoloft for about a month, he experienced poor sleep, increased irritability and a short temper. He started back on Zoloft in May 2011, but switched to Lexapro in July 2011. In April 2012, Staford complained of increased insomnia and nightmares. In December 2012, Staford said he had experienced trouble sleeping ever since he was involved in a "shootout." Dr. Turks prescribed sleep medication. In February 2014, Staford reported a worsening of PTSD symptoms, including shakiness, nightmares, insomnia and irritability. In April 2014, Staford reported increased anxiety. In July and August 2014, Staford reported that his "frequent nightmares and depressive thoughts" had been worsening for 9 to 10 months. Dr. Turks increased the dosage of Staford's antidepressant.

¶ 14    Staford testified that approximately 15 to 30 minutes after the shooting incident on December 11, 2010, he felt sick to his stomach, dizzy, shaky and unable think straight. Days later,

he had symptoms of anxiety, panic, nightmares, short temper and anger. Soon after the shooting incident, he took a leave of absence for a month and-a-half. He sought treatment with Dr. Puls during that time. He returned to work for eight months before taking a second leave of absence that lasted one month. He returned to work for about a year before taking a third leave of absence that also lasted approximately one month. After that, he returned to work for a year until he was placed on administrative leave for misconduct.

¶ 15        Staford testified that he still experiences nightmares, panic attacks, anger, loss of control, and impatience. He estimated that he called in sick to work approximately 20 to 30 times in 2012 and 2013 because of his PTSD symptoms. He used up all his sick time and took off additional unpaid days, explaining, "I didn't feel it was safe for me to be at work." Staford met with Dr. Reff, Dr. Tuder and Dr. Frank for approximately 90 minutes each.

¶ 16        Following the hearing, the Board concluded that Staford met his burden of proving that he suffered from a disability but failed to prove that his disability was caused by the December 11, 2010 incident. The Board found that Staford "recovered from the effects of the[] December 11, 2010 incident." The Board found the supplemental report of Dr. Reff "most persuasive." The Board stated that the opinions of Drs. Tuder and Frank were "less persuasive" because they did not "address the possibility of intervening or precipitant events as being a factor in Applicant's mental illness." The Board agreed with Dr. Reff's conclusion that the "precipitant" to Staford's 2016 hospitalization was his discovery that his estranged wife was pregnant and planned to move in with father of her child, "not the December 11, 2010 incident."

¶ 17        Additionally, the Board gave "little weight to the opinion of *** Dr. Puls, regarding causation" because "he is not a medical doctor" and his reports "did not contain any reference to [Staford's] abuse of prescription drugs." The Board also found the bases for Dr. Puls' opinion to

be "unreliable", stating that he "only relied on [Staford's] statements at an initial examination to make his determinations." Finally, the Board stated that its decision was based in part on its observations of Staford, who the Board found "evasive, if not dishonest, regarding his drug use."

¶ 18        Staford appealed the Board's decision, filing a complaint for administrative review in the circuit court. The circuit court reversed the Board's decision, finding that it was against the manifest weight of the evidence because all the medical professionals who examined Staford agreed that he "was suffering from PTSD after the December 11, 2010 incident and this was the basis for his disability." The court stated:

> "The Court finds the evidence shows Plaintiff suffered PTSD as a result of the December 11, 2010 incident where Plaintiff was chasing a suspect on foot when the suspect shot at Plaintiff. When Plaintiff attempted to return fire, his gun jammed. This is a special risk associated with serving as a police officer and as a result, Plaintiff has met his burden of proving his PTSD disability resulted from the performance of an act of duty."

¶ 19                                ANALYSIS

¶ 20        Under section 3-114.1 of the Illinois Pension Code (Code), a police officer is entitled to a line-of-duty pension if his disability results from "the performance of an act of duty." 40 ILCS 5/3-114.1 (West 2018). An officer must prove his disability resulted from a specific, identifiable act of duty unique to police work. *Robbins v. Board of Trustees of Carbondale Police Pension Fund,* 177 Ill. 2d 533, 542 (1997).

¶ 21        Section 3-148 of the Code (40 ILCS 5/3-148) (West 2018)) states that judicial review of an administrative agency's decisions is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2018)). The Administrative Review Law provides that "[t]he findings and

7

conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct." 735 ILCS 5/3-110 (West 2018). In deciding questions of fact, it is the agency's function to judge the credibility of the witness, assign weight to the evidence, and resolve conflicts in medical evidence. See *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 540 (2006). We will not disturb the Board's findings of fact unless an opposite conclusion is clearly apparent. See *id.* at 534.

¶ 22        Nevertheless, the deference we afford an administrative agency's decision, even under the manifest weight of the evidence standard, "is not boundless." *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 507 (2007); see also *Kouzoukas v. Retirement Board of Policemen's Annuity & Benefit Fund,* 234 Ill. 2d 446, 465 (2009) (while an agency's credibility determinations "should be afforded considerable weight, they are not immune from review"); *Bowlin v. Murphysboro Firefighters Pension Board of Trustees,* 368 Ill.App.3d 205, 211 (2006) ("our review cannot amount to a rubber stamp of the proceedings below merely because the Board heard witnesses, reviewed records, and made the requisite findings"). "Even when the decision is supported by some evidence, which if undisputed would sustain the administrative finding, it is not sufficient if upon a consideration of all the evidence the finding is against the manifest weight." *Bowlin,* 368 Ill. App. 3d at 211-12. A reviewing court should not hesitate to reverse an agency's determination if the record does not show evidentiary support for it. *Id*. at 212.

¶ 23        An administrative agency's decision is against the manifest weight of the evidence if it is supported solely by the opinion of one expert whose conclusions are not based on relevant, material evidence. See *Wade*, 226 Ill. 2d at 505. Where a board relies on the opinion of one expert, which is at odds with all other medical professionals and is not supported by the medical records, the board's decision is against the manifest weight of the evidence. See *id.* at 506; see also *Rose v.*

8

*Board of Trustees of Mount Prospect Police Pension Fund*, 2011 IL App (1st) 102157, ¶¶ 97-106 (board's finding that applicant had fully healed from accident was against the manifest weight of the evidence where it was supported by only one of the nine physicians); *Devaney v. Board of Trustees of Calumet City Police Pension Fund*, 398 Ill. App. 3d 1, 10-11 (2010) (board's decision to deny line-of-duty disability to applicant was against manifest weight of the evidence where three out of four doctors found work injury caused disability); *Hahn v. Police Pension Fund of City of Woodstock*, 138 Ill. App. 3d 206, 211 (1985) (where three out of four psychiatrists who examined officer concluded that he was unfit for duty, board's decision disallowing disability pension was against the manifest weight of the evidence).

¶ 24        When a matter is on appeal from the circuit court's judgment in an administrative review action, the appellate court reviews the decision of the Board, not the reasoning of the circuit court. *Marconi*, 225 Ill. 2d at 531. An appeal presenting the question of whether the evidence supports the Board's denial of an application for a line-of-duty disability pension is a question of fact. *Id.* at 534.

¶ 25        In this case, four medical professionals (Dr. Puls, Dr. Reff, Dr. Tuder and Dr. Frank) gave opinions about Staford's ability to return to work as a police officer. All four doctors agreed that Staford was disabled and unable to work as a police officer. Initially, all four doctors also agreed that Staford's disability was PTSD caused by the December 11, 2010 incident. However, Dr. Reff later changed his opinion, stating that Staford's disability was not PTSD but an inability to follow rules and codes of conduct. Nevertheless, Dr. Reff admitted that Staford suffers from PTSD and would most likely continue to suffer from symptoms of PTSD for the rest of his life.

¶ 26        The Board's rationale for denying Staford's line-of-duty disability was that he had "recovered from the effects of the[] December 11, 2010 incident." However, there was no medical

testimony or evidence supporting this determination. Even Dr. Reff admitted that Staford continues to suffer from PTSD symptoms as a result of the December 11, 2010 incident and opined that Staford's "prognosis for sustained remission of symptoms is guarded to poor." Additionally, the medical records, as well as the testimony of both Staford and his treating psychologist, Dr. Puls, establish that Staford continuously experienced PTSD symptoms until and long after his resignation from the department.

¶ 27    The Board seemed to rely on Dr. Reff's conclusion that despite his PTSD, Staford "was able to successfully function full duty for extended periods of time from the date of the shooting until he ultimately stopped working." However, this opinion is not supported by the evidence. The record establishes that Staford took three separate leaves of absence of at least one month each from January 2011 to November 2012. While Staford did not take a leave of absence in 2013, he testified that he took off more than his allotted sick days because his PTSD symptoms made it unsafe for him to be at work. Additionally, Staford's behavior on the job was described as "erratic" in 2013 and 2014, ultimately leading to his suspension. Also during this time, Staford's abuse of prescription medication was increasing.

¶ 28    Furthermore, the Board's decisions to discount the medical opinions of Dr. Tuder and Dr. Frank were baseless. The Board found the reports of Drs. Tuder and Frank to be "less persuasive" than Dr. Reff's because Drs. Tuder and Frank allegedly failed to "address the possibility of intervening or precipitant events as being a factor in [Staford's] mental illness." However, the Board's allegation is not supported by the evidence. Both Dr. Tuder and Dr. Frank considered whether Staford had preexisting conditions and found that he had none. Dr. Tuder stated that Staford's disability was caused entirely by PTSD, not any preexisting condition. Additionally, Dr.

10

Frank considered Staford's drug abuse and found that it was likely caused by Staford's PTSD because it began after the December 11, 2010 incident.

¶ 29    Additionally, we reject the Board's conclusion that Dr. Puls' opinions were "unreliable." Dr. Puls was the only treating professional to testify at the hearing and provide an opinion about Staford's disability. Dr. Puls testified that he saw Staford 60 times for 45 minutes each session for a total of 2700 hours. The other medical professionals, including Dr. Reff, spent only 90 minutes with Staford. The opinion of a physician who had the "benefit of assessing the plaintiff's condition through an extended course of treatment" is entitled to greater weight than that of appointed evaluators. See *Devaney*, 398 Ill. App. 3d at 12. Contrary to the Board's finding that Dr. Puls did not consider Staford's drug use in diagnosing and treating Staford, Dr. Puls testified that Staford discussed his drug use at his initial appointment and at subsequent appointments. Dr. Puls considered Staford's drug use, concluding that it was caused by Staford's PTSD.

¶ 30    Finally, we find the Board's determination that Staford's 2016 hospitalization was not a result of his PTSD to be unsupported by the evidence. Relying on Dr. Reff's opinion, the Board found the "precipitant" of Staford's June 2016 hospitalization to be marital problems, not the December 11, 2010 incident. However, the Board's conclusion ignores that PTSD has far-ranging effects and could have very well been the cause of Staford's marital problems. See Christine Stewart, MD & Betty Brutman, MD, JD, 6 Attorneys Medical Advisor § 45:23 (2020) ("PTSD victims frequently see their marital relationship follow a standard spiral, in which conflict with the spouse is followed by loss of employment, which leads to increased contact and conflict with the spouse, along with financial problems exacerbating conflicts, leading to divorce.") The physicians treating Staford during his hospitalization diagnosed him with both PTSD and major depressive disorder. The medical evidence, therefore, does not support the Board's conclusion that Staford's

11

PTSD caused by the December 11, 2010 event had nothing to do with Staford's 2016 hospitalization.

¶ 31 Here, the Board's conclusion that Staford was not suffering from PTSD that rendered him unable to perform his duties as a police officer was against the manifest weight of the evidence. We affirm the trial court's order reversing the Board's decision.

¶ 32                                           CONCLUSION

¶ 33 The judgment of the circuit court of Will County is affirmed.

¶ 34 Affirmed.